135 Ill. App.3d 1017 (1985)
482 N.E.2d 372
In re T.R., a Minor (The People of the State of Illinois, Petitioner-Appellee,
v.
Warren Autio, Respondent-Appellant).
No. 84-107.
Illinois Appellate Court  First District (4th Division).
Opinion filed August 1, 1985.
James J. Doherty, Public Defender, of Chicago (Frances Sowa, Assistant Public Defender, of counsel), for appellant.
Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Patrick Foley, and Sheila Rudin, Assistant State's Attorneys, of counsel), for the People.
Judgment affirmed.
PRESIDING JUSTICE JIGANTI delivered the opinion of the court:
The State initiated this action by petitioning the circuit court of Cook County to terminate the parental rights of Elizabeth Ranger Liaquat and respondent Warren Autio, natural parents of the minor, T.R., on the grounds of unfitness and to appoint a guardian empowered to consent to T.R.'s adoption. After a hearing, the court found the respondent Autio unfit and terminated his parental rights. However, because Elizabeth Liaquat was determined to be fit and able to retain her parental rights, the court refused to appoint a guardian. *1018 The respondent Autio has appealed, contending that the court lacked the statutory authority to terminate his parental rights in the absence of an order appointing a guardian to consent to T.R.'s adoption. He also argues that the finding of unfitness was not supported by clear and convincing evidence and was based, in part, upon a statutory factor that did not apply to him.
T.R. and her sister, Jessica, were initially removed from Elizabeth Liaquat's custody in February 1980, when she left them with a babysitter and failed to return. T.R., who was six years old at the time, was placed in a foster home, then returned to Elizabeth in August 1980 upon Elizabeth's successful completion of a service plan with the Department of Children and Family Services (DCFS). Four months later, the children were again left with a babysitter for longer than the agreed-upon time. The babysitter returned the children to Elizabeth's apartment and called the police. The respondent came to the apartment while the police were there and, upon learning the situation, was able to locate Elizabeth. The respondent was not married to Elizabeth and did not reside with her. T.R. was again placed in foster care and subsequently adjudicated a ward of the court based upon a finding of neglect.
On May 13, 1982, the State filed a petition requesting the court to terminate the parental rights of T.R.'s natural parents and to appoint a guardian to consent to her adoption. With respect to the respondent, the petition alleged that he was an "unfit person" within the meaning of the Adoption Act (Ill. Rev. Stat. 1983, ch. 40, par. 1501 et seq.) based upon the following factors:
"(a) abandonment of the child;
(b) failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare; and
* * *
(m) failure by a parent to make reasonable efforts to correct the conditions which were the basis for the removal of the child from such parent, or to make reasonable progress toward the return of the child to such parent within 12 months after an adjudication of neglected minor * * *." Ill. Rev. Stat. 1983, ch. 40, par. 1501(D)(a),(b),(m).
At a hearing[1] on the petition, Pamela Baldwin, a social worker *1019 employed by the DCFS, testified that she was assigned to T.R.'s case in February 1980 and met the respondent for the first time at a court hearing held in May 1981. At that time, the respondent expressed a desire to visit with T.R., and Baldwin set up an appointment to meet with him on June 4, 1981, to discuss the possibility of such visits. At that meeting, the respondent told Baldwin that he wanted Elizabeth to have custody of T.R. and that he wished visitation rights. Based upon this information, Baldwin scheduled a June 24, 1981, meeting to sign a DCFS service plan. However, when the respondent did not keep the appointment, Baldwin sent him a letter and a copy of the service plan. He failed to answer the letter. In September 1981, the respondent attempted to participate in a visit scheduled for Elizabeth, but was not permitted to do so.
Baldwin stated that her next contact with the respondent occurred on November 5, 1981, when he came to her office and signed a service plan. The terms of the plan were that he: (1) attend six counseling sessions to determine his parenting skills, interest in the child and future support of Elizabeth should she regain custody; (2) undergo a medical examination; and (3) attend scheduled visits with T.R. Because the respondent kept only two of the six counseling appointments, no visits were scheduled, and Baldwin next saw him in court in June 1982. He apparently attempted to contact Baldwin at her office one month later to schedule visits, but she was not available that day. The respondent failed to respond to Baldwin's letters requesting that he contact her again to arrange such visits.
Baldwin's next contact with the respondent occurred in May 1983, when he appeared in court represented by counsel. At that time, Baldwin scheduled monthly visits for June through October 1983. At the June visit, which was the respondent's first visit with T.R. since her placement with the DCFS in December 1980, he explained that he failed to complete the previously scheduled counseling sessions because he felt that he would have been required to make payments toward T.R.'s care. Baldwin explained that all parents were instructed to complete certain payment determination forms as part of a DCFS service plan. At the October visit, the respondent reiterated his desire to have the child returned to Elizabeth's custody. He stated that if he were given custody and Elizabeth wanted T.R., he would give the child to Elizabeth. The respondent attended all of the visits except one, which he cancelled because of a job interview.
In September 1983, Baldwin visited the respondent's home to determine its suitability should he receive custody of T.R. She found the home questionable in terms of room, and testified that the respondent's *1020 67-year-old mother failed to express a strong interest in parenting T.R., indicating that she would agree to do so for the respondent's sake.
The respondent testified that he first became aware that T.R. had been involved with the DCFS on December 28, 1980, when he went to Elizabeth's apartment and found the police with the children. He located Elizabeth, and when the police refused to leave T.R. in her care, requested that he be allowed to take her. This request was denied. In May 1981, he asked Pamela Baldwin to allow him to visit T.R. She responded that he would have to sign a service plan, which he did on November 5, 1981. However, he testified that he failed to complete the required counseling sessions because the counselor made unfavorable comments about Elizabeth.
The respondent stated that prior to June 1982, he made six requests for visits, and was told each time that he had to complete a financial form showing his ability to pay support for T.R. He refused because he felt the State was "charging" him to see his child. In June 1982, he offered to bring clothing instead of money and did so during one of his visits the following year. In May 1983, after his attorney informed him that he had an unconditional right to visitation, the respondent contacted Baldwin to schedule the visits. The respondent testified that during the second visit, T.R. indicated that she wanted to go home with either her mother or him.
At the conclusion of the hearing, the trial court refused to find the respondent unfit on the grounds of abandonment, but did find him unfit on the two remaining grounds alleged in the petition. Based on the finding of unfitness, the court terminated the respondent's parental rights with respect to T.R.
 1 The respondent first contends that the trial court lacked the statutory authority to terminate his parental rights in the absence of an order appointing a guardian to consent to T.R.'s adoption. As previously noted, no guardian was appointed because the court found Elizabeth fit and therefore able to retain her parental rights.
Section 5-9 of the Juvenile Court Act, cited by the respondent in support of his position, provides as follows:
"(2) If the petition prays and the court finds that it is in the best interests of the minor that a guardian of the person be appointed and authorized to consent to the adoption of the minor, the court * * * after finding based upon clear and convincing evidence, that a non-consenting parent is an unfit person * * * may empower the guardian of the person of the minor, * * * to consent to the adoption. * * * An order so empowering the guardian *1021 to consent to adoption terminates parental rights, deprives the parents of the minor of all legal rights as respects the minor and relieves them of all parental responsibility for him, and frees the minor from all obligations of maintenance and obedience as respects his natural parents." (Emphasis added.) Ill. Rev. Stat. 1983, ch. 37, par. 705-9(2).
It is a primary rule of statutory construction that the intention of the legislature should be ascertained and given effect. (People v. Robinson (1982), 89 Ill.2d 469, 475, 433 N.E.2d 674.) In determining legislative intent, the court must consider the statute in its entirety, as well as its objects and the possible consequences from interpreting it in a particular manner. In re D.J.B. (1982), 107 Ill. App.3d 482, 484, 437 N.E.2d 888.
The respondent argues that the above statute should be construed as allowing the termination of parental rights only in those situations in which a guardian is appointed to consent to the child's adoption. Considering the statute as a whole, the legislature appears to have envisioned a situation in which either both natural parents are proved unfit or one parent consents to the adoption and the other is proved unfit. Under those circumstances, it is desirable for the child to acquire new parents through adoption, and the court will ordinarily appoint a guardian empowered to consent to the adoption. Because of the child's need for stability in the contemplated new relationship, the legislature provided that the appointment of a guardian will also serve to terminate the parental rights of the child's natural parents. In re Grant (1975), 29 Ill. App.3d 731, 735, 331 N.E.2d 219.
However, the situation at the case at bar differs from the one described above in that one of the natural parents was not proved unfit. It was therefore unnecessary for the court to appoint a guardian, since the mother retained her parental rights with respect to the child. We do not believe that the legislature intended, by drafting the language in question, to preclude the trial court from terminating the parental rights of a parent who was proved unfit by clear and convincing evidence.
 2 The respondent next contends that the finding of unfitness was erroneous for two reasons. First, he argues that the court's determination that he failed to maintain a reasonable degree of interest, concern and responsibility as to the child's welfare was not supported by clear and convincing evidence. Second, he claims that the statutory factor concerning reasonable efforts to correct the conditions which caused the child's removal was improperly applied to him because he was not the custodial parent.
*1022 In a proceeding to terminate parental rights, the State bears the burden of proving unfitness by clear and convincing evidence. (In re Paul (1984), 101 Ill.2d 345, 352, 461 N.E.2d 983.) A finding of parental unfitness based upon failure to demonstrate a reasonable interest in the child's welfare is improper where the evidence indicates that the child's custodian denied or discouraged the parent's requests to visit the child. Davis v. Bughdadi (1983), 120 Ill. App.3d 236, 243, 458 N.E.2d 177.
The evidence in the instant cause indicates that although T.R. was removed from her mother's custody in December 1980, the respondent's first visit with her took place in June 1983. The respondent's testimony that his frequent attempts to visit T.R. were frustrated by the DCFS was contradicted by Pamela Baldwin, who testified that his efforts to arrange visits were very sporadic. The trial court apparently chose to believe Baldwin's testimony in that regard and to reject the testimony of the respondent. Viewing the evidence as a whole, it appears that the respondent's efforts to visit T.R. were half-hearted and easily abandoned when he was faced with standard DCFS procedures regarding visitation. When he did, in fact, sign a service plan, he lacked the commitment necessary to complete its terms, keeping only two of the six counseling sessions he agreed to attend. Under these circumstances, we believe the evidence was sufficient to show that the respondent failed to maintain a reasonable degree of interest, concern or responsibility as to T.R.'s welfare.
Because the Adoption Act provides that a finding of unfitness may be based upon "any one or more" of the grounds listed, our finding that the State proved one allegation of unfitness makes it unnecessary for us to address the issue of whether the other statutory factor was properly applied to the respondent. (Ill. Rev. Stat. 1983, ch. 40, par. 1501(D).) Accordingly, the judgment of the circuit court is affirmed.
Affirmed.
JOHNSON and LINN, JJ., concur.
NOTES
[1] Because the evidence concerning Elizabeth Liaquat is not relevant to this appeal, it will not be summarized here. However, it appears that the trial court's refusal to find her unfit was based largely upon her successful efforts to overcome her alcoholism, which constituted a major factor in her neglect of T.R.