744 N.E.2d 916 (2001)
In re C.M., B.M. and E.M., Minors, Respondents-Appellees (The People of the State of Illinois, Petitioner-Appellee,
v.
Gloria M., and Ralph M., Respondents-Appellants).
Nos. 1-99-1671, 1-99-2063.
Appellate Court of Illinois, First District, Fourth Division.
February 8, 2001.
*918 Peter J. Woods, Evergreen Park, for Gloria M.
Thomas J. Esler, Chicago, for Ralph M.
Richard A. Devine, State's Attorney of Cook County (Renee Goldfarb, Nancy Grauer Kisicki and William Jason Gatzulis, Assistant State's Attorneys, of counsel), for Appellee.
Justice BARTH delivered the opinion of the court:
Respondents, Ralph and Gloria M., are the natural parents of C.M., born May 8, 1997, B.M., born January 18, 1989, and E.M., born October 15, 1991. On May 3, 1999, Gloria's parental rights were terminated as to all three children on the basis of findings that she failed to maintain a reasonable degree of interest in her children's welfare; failed to protect her children from an injurious environment; failed to make reasonable progress toward the return of her children; and was unable to discharge her parental responsibilities due to mental impairment. Ralph's parental rights were also terminated on May 3, 1999, on the same grounds as Gloria, save that no finding of unfitness based on mental impairment was entered in Ralph's case. The trial court further found that it was in the best interests of the three minors that the parental rights of respondents be terminated, and a guardian was appointed for the minors with the right to consent to their adoption.
On appeal, respondents ask that both of the above orders be vacated, and present for our consideration the following issues: (1) whether the trial court properly allowed Allison Greenwald, a case manager, to testify telephonically where respondents objected and the State proffered no explanation for Greenwald's absence from the courtroom; (2) whether the State proved by clear and convincing evidence that respondents were unfit; and (3) whether it was in the best interests of the children to terminate respondents' parental rights.

FACTUAL BACKGROUND
The children first came to the attention of the Illinois Department of Children and Family Services (DCFS) on May 1, 1993, after a citizen witnessed Gloria dragging B.M. onto a bus. An investigation was begun, as a result of which all three children were removed from the custody of respondents from May 17, 1993, to April 6, 1995, on allegations of inadequate food and injurious environment. One year later, in April 1996, DCFS again became involved, as a result of a phone call from the counselor of B.M.'s school.
On or about April 18, 1996, B.M.'s speech pathologist at Hammond Elementary School took her to Carmen Martinez, the school's counselor, and showed Martinez a bruise on B.M.'s forehead. When asked about the origins of the bruise, B.M. explained that Ralph had grabbed her by the hair and dragged her across the floor, after she received a "D" on her report card. B.M. stated that, after she was dragged, Ralph made her stand in the corner, on one leg at a time, with her hands raised above her head for over an hour. B.M. also stated that she hated Ralph because he did "nasty" things to her, specifically, her made her "sit on his stick," which she identified as his penis. B.M. claimed that Ralph did this to her siblings as well. In addition, B.M. told Martinez that Ralph took baths with her and sometimes slept with her. Martinez called DCFS.
On or about April 19, 1996, Ralph admitted to Chicago police officer Jerry Simandel that he had disciplined B.M. and caused her bruises. Protective custody was then taken of the three children.
*919 On April 19, 1996, the State filed petitions to adjudicate C.M., B.M., and E.M. wards of the court. The petitions alleged sexual abuse and excessive corporal punishment of B.M., and substantial physical risk of physical injury to C.M. and E.M. based on the treatment of B.M..
On May 1, 1996, a temporary custody hearing was held at which both parties stipulated that, if called to testify, DCFS worker James Johnson would state that on April 25, 1996, B.M. was observed in school with a large bruise on her forehead. It was also stipulated that Johnson would state that on April 25, 1996, a protective plan was implemented with Gloria, requiring that she not allow Ralph to come into contact with the children. However, on April 26, 1996, Gloria violated that plan by allowing Ralph back into the home and allowing him to have contact with the children. Finally, it was stipulated that Johnson would state that B.M.'s complaints were also heard by medical personnel at Cook County Hospital and that probable cause and immediate necessity existed.
The trial court then awarded temporary custody to DCFS; ordered that all visits between the children and respondents be supervised; and provided that the children did not have to visit with respondents if they chose not to. All three children were then taken to Mount Sinai Hospital for a five-day comprehensive evaluation before being placed into foster care. On October 1, 1996, the trial court adjudicated all three children wards of the court and granted DCFS guardianship. On January 16, 1997, a permanency hearing was held and the hearing officer determined that the goal for all three children should be changed from return home to adoption. Ralph filed an objection the permanency goal, but on March 18, 1997, this court found the change in goal appropriate.
On May 3, 1999, the unfitness hearings were held.
The first to testify at the hearings was Ralph. Ralph could not recall the dates of his children's birthdays. He conceded that he had been convicted in July 1992 of armed violence and burglary, and in January 1996 of aggravated driving under the influence. Ralph admitted to having engaged in domestic disputes with Gloria, and admitted that Gloria checked herself into the hospital following one of those disputes in May 1996. Although he was not arrested for the May 1996 dispute, he was arrested for a prior dispute, during which Gloria's finger was broken. Ralph recalled that the children were present in the home during some of those disputes.
Ralph stated that, at the time of the hearing, he was living with Gloria. He admitted that they continue to argue. Ralph claimed to have been under the influence of alcohol and/or drugs during the times he and Gloria fought.
Next to testify was Gloria, although she was initially very reluctant to do so. She expressed to the trial court her fear of having a stroke if called, as a result of the pressure she believed would be placed on her while she was on the witness stand. She threatened to sue the trial court judge for "attempted murder," for forcing her to testify, and was heard to mutter "bitch" under her breath as she approached the stand. Finally, she warned the trial court, "I can't promise you there will be no attitude."
Gloria remembered having received a letter from B.M., which stated "I hate you Gloria and Ralf. I don't want to do anything with you." The letter was dated October 10, 1996, and was signed "B.M.," except the child's last name was crossed out, and an arrow drawn toward it next to which it was written "I don't want that name anymore." Gloria insisted the letter was a forgery.
Gloria admitted to having checked herself into St. Anthony's Hospital in May 1996 following a fight with her husband which commenced when she woke up with "a fist in [her] face." Gloria stated that she and Ralph were still living together. She explained that Ralph was home "90 percent" of the time, and during the rest of the time he would run in and out, sometimes *920 staying away for weeks at a time. Gloria stated that Ralph was still drinking at the time of the hearing.
Next was Dr. John Murray, a licensed psychologist and assistant director of psychology at the Juvenile Court Forensic Clinical Services. Both parties stipulated to his status as an expert in his field. Dr. Murray testified that he evaluated Gloria on June 20, 1998.[1] The evaluation consisted of Dr. Murray's review of documents, and a 3½ hour interview. Pursuant to his evaluation, Dr. Murray diagnosed Gloria with borderline personality disorder. He explained that this sort of disorder is by definition chronic and long-standing, with its origins in childhood. He also explained that people who have borderline personality disorder "basically decompensate and become psychotic and/or paranoid" under periods of stress.
In Dr. Murray's opinion, Gloria's borderline personality disorder prevents her from discharging her parental responsibilities, and this inability extends to the future, "limiting the likelihood that she would respond to treatment in any reasonable time frame."
Next to testify was Allison Greenwald. The State called her as a "telephonic" witness, to which attorneys for both respondents immediately objected. The State produced no explanation for Greenwald's absence from the courtroom. The trial court overruled the objections and allowed Greenwald to testify telephonically, stating:
"I think the only thing that it actually causes is not rigorous cross-examination. It just causes me not to be able to entirely evaluate the demeanor of the witness as the witness testifies. And for that, I will allow it for weight. And that will also necessarily impact the weight of the testimony; but having said that, I think there should be full and fair cross-examination. And I will of course allow that."
Greenwald then testified that she was the case manager assigned to manage this case between December 30, 1996, and June 1997. Her duties included supervising the visits between respondents and C.M., which initially took place on a weekly basis and then, after the goal in this case was changed to adoption, on a monthly basis. According to Greenwald, neither Gloria nor Ralph completed the tasks assigned to them in their service plans, which were implemented November 11, 1996, and evaluated on June 9, 1997. Both received an evaluation of "unsatisfactory." Greenwald explained that Gloria failed to attend weekly counseling and did not seek legal help in escaping her abusive relationship with Ralph. Greenwald also testified that, during Gloria's supervised visits with C.M., "there was not much parental guidance" and that Gloria seemed to relate to C.M. on his level and often "lost her temper in front of him." Greenwald testified, however, that Gloria completed parenting classes in accordance with the service plan.
She stated that Ralph failed to take responsibility for or even to recognize the reasons why this case was brought to the attention of DCFS. Although Ralph attended some Alcoholics Anonymous and Narcotics Anonymous meetings, he did not do so with the frequency outlined in the service plan. Ralph too completed parenting classes.
Next to testify was Carmen Martinez, the school counselor who spoke to B.M. in May 1996 and subsequently contacted DCFS, as summarized above.
Next was Gwendolyn Coleman, an employee of Youth Outreach Services, and the caseworker assigned to this case from July 1997 to October 1998. During the time Coleman was assigned to this case, neither Gloria nor Ralph was participating in services. Coleman stated that since the goal in this case was changed to adoption, such *921 services were optional, although referrals were readily available.
Coleman evaluated respondents' October 1997 and April 1998 service plans. She gave "unsatisfactory" evaluations to both Gloria and Ralph on both plans. Coleman explained that this was due to the fact that neither parent was engaged in any of the services recommended to them in the service plans, nor did they express any interest in being referred for those services.
Coleman also supervised Gloria and Ralph's monthly visits with C.M. As to the visits between Gloria and C.M., Coleman observed inappropriate displays of affection by Gloria toward C.M., including a tendency on Gloria's part to kiss C.M. frequently on the mouth.
During a visit in December 1997, C.M. told Gloria that his favorite basketball player was Michael Jordan. Gloria became visibly upset and asked C.M., "[C]an't you find a white basketball player who you like?"
During a visit in January 1998, C.M. was very excited because he had just gotten a new haircut and was anxious to show it to Gloria. Gloria immediately disapproved of the haircut, and told C.M. that it was in the style of "gangbanging spics." Later that visit, C.M. presented Gloria with a school picture of himself, along with a letter in which he wrote that he was happy and that she (Gloria) didn't have to worry about him. Gloria became upset and threatened to kill C.M.'s foster parent by bombing her house, which upset C.M. very much. As a result of that incident, Coleman stopped the monthly visits.
As to Ralph, Coleman stated that, when and if he attended a visit with C.M., he would stay for only 15 to 20 minutes of the hour allotted. The interaction between Ralph and C.M. during those brief visits was, per Coleman, minimal.
Gloria then took the stand on her own behalf and insisted she went to all of the counseling and therapy that was required of her by the service plans. She explained that the reason she did not follow up with Gwendolyn Coleman was because DCFS would not provide her with any financial assistance. She also stated that she had attempted, on a number of occasions, to contact Coleman, but Coleman did not return her calls. Finally, Gloria claimed that it was B.M.'s foster parents and not B.M. who wrote the letter B.M. gave her telling her that B.M. hated her and Ralph.
The parties argued in closing, after which the trial court made the following findings:
(1) both parents failed to make reasonable progress toward the return of the children within 12 months after the adjudication of neglect under section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 1996)), and section 2-29 of the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/2-29 (West 1998)).
(2) both parents failed to maintain a reasonable degree of interest, concern or responsibility as to the children's welfare under section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 1998)) and section 2-29 of the Act (705 ILCS 405/2-29 (West 1998)).
(3) both parents had failed to protect the children from injurious conditions in the environment, in violation of section 1(D)(g) of the Adoption Act (750 ILCS 50/1(D)(g) (West 1998)) and section 2-29 of the Act (705 ILCS 405/2-29 (West 1998)).
(4) Gloria was unable to discharge parental responsibilities because of mental impairment, mental illness or mental retardation and this inability would extend beyond a reasonable time under section 1(D)(p) of the Adoption Act (750 ILCS 50/1(D)(p) (West 1998)) and section 2-29 of the Act (705 ILCS 405/2-29 (West 1998)).
A best interests hearing was then held. The first witness to testify therein was Adura Stephens, an employee of Youth Outreach Services, and C.M.'s caseworker. Stephens testified that C.M. is currently in foster placement with Pelar Toledo and that she (Stephens) visits C.M. in that placement twice a month. Stephens described the relationship between Toledo *922 and C.M. as very loving and affectionate, and stated that they have bonded very well together. C.M. refers to Toledo as "mom." Stephens observed no signs of abuse, neglect, or corporal punishment in Toledo's home and stated that Toledo is very willing to adopt C.M., who is very excited about being adopted. He enjoys a close relationship with Toledo's extended family as well.
C.M. has several special needs, including the fact that he has been diagnosed with pervasive developmental disorder with slight autism. He is currently in special education classes, and Toledo has hired a tutor for him. Since he began sessions with his tutor, C.M.'s grades have improved quite a bit. Stephens explained that, prior to this placement, C.M. had problems with personal hygiene, specifically, he did not know how to bathe or clean himself properly. He has since acquired those skills.
C.M. is now involved in baseball and with a church youth group. He has several close friends in the neighborhood where he resides.
Stephens testified that she believes termination of respondents' parental rights with respect to C.M. is in C.M.'s best interests and would help to achieve the goals of permanency and stability set for C.M.
Next, Pelar Toledo testified that C.M. has been with her for nearly 2½ years and that she loves him dearly. She stated that she is actively involved in C.M.'s therapy.
Next to testify was Gabe Nagy, a DCFS employee who provides courtesy supervision of B.M. and E.M. Nagy stated that the girls have been in their current placement since July 1996. Nagy has been out to visit the girls in that placement and observed that their foster mother appeared very committed to them. He stated that the girls always appear clean and well cared for and interact reasonably well with their foster parents and siblings.
Nagy testified that the foster mother appears very interested in adoption and that B.M. and E.M. have indicated they would like to remain in that household. Nagy observed no signs of abuse, neglect or corporal punishment in the home. The girls are both in therapy for behavioral problems and because of anxiety over their current situation, an anxiety which Nagy believes becomes more pronounced when the possibility of the girls returning to live with Gloria and Ralph is discussed. Both girls have expressed fear about having to return home during conversations with Nagy.
The girls are involved in Girl Scouts and play baseball.
Nagy stated that he believes it is in the best interests of B.M. and E.M. that the parental rights of Gloria and Ralph be terminated.
The trial court found that it was in the best interests of the minors to terminate the parental rights of both respondents as to all three children.

ANALYSIS

I. Admission of Telephonic Testimony
Respondents both contend that the trial court's ruling which, over objection, allowed Allison Greenwald to testify telephonically was a denial of due process. The State and Public Guardian respond that the admission of Greenwald's testimony was proper since the trial court took into account its inability to assess Greenwald's demeanor and accorded her testimony reduced weight; the Act does not prohibit such a procedure; and respondents conducted adequate cross-examination of Greenwald. Alternatively, the State maintains, even if the admission of Greenwald's testimony was error, it was harmless in light of parallel testimony from Gwendolyn Coleman.
Greenwald, employed by Youth Outreach Services, was assigned to manage this case from December 30, 1996, to June 1997. Her responsibilities as case manager included supervising the visits between respondents and C.M., which took place on a weekly, and then on a monthly basis. *923 She was not present in court on the day of the unfitness hearings, but was called by the State as a telephonic witness. Over the objection of both respondents, the trial court ruled that Greenwald's testimony by telephone was admissible, explaining:
"I think the only thing that it actually causes is not rigorous cross-examination. It just causes me not to be able to entirely evaluate the demeanor of the witness as the witness testifies. And for that, I will allow it for weight. And that will also necessarily impact the weight of the testimony, but having said that, I think there should be full and fair cross-examination. And I will of course allow that."
The court made no inquiry, nor is it disclosed anywhere in the record, as to why Greenwald was not able to testify in person.
During her testimony, Greenwald discussed and commented on respondents' behavior during the visits she supervised, and on the efforts, or lack of efforts, on the part of respondents to comply with the goals outlined in the service plans.[2] The record indicates that the trial court placed great reliance on Greenwald's testimony in making its finding that respondents had failed to make reasonable progress toward the return of the minors under section 1(D)(m). Respondents argue that because the admission of Greenwald's testimony was erroneous so too was the finding of unfitness pursuant to section 1(D)(m).
We consider first whether telephonic testimony was properly admitted under the circumstances of this case.
In a termination of parental rights proceeding, we determine whether due process was afforded in accordance with the factors established by the United States Supreme Court in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Those factors are as follows:
"First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."
See In re C.J., 272 Ill.App.3d 461, 465, 208 Ill.Dec. 833, 650 N.E.2d 290 (1995); In re M.R. et al., Minors, 316 Ill.App.3d 399, 402-03, 249 Ill.Dec. 325, 736 N.E.2d 167 (2000).
Applying the first factor, we recognize that respondents have a fundamental liberty interest in the care, custody and control of their children. See People v. R.G., 131 Ill.2d 328, 354, 137 Ill.Dec. 588, 546 N.E.2d 533 (1989); In re D.R., 307 Ill.App.3d 478, 483, 241 Ill.Dec. 93, 718 N.E.2d 664 (1999). The United States Supreme Court has stated that the parent-child relationship is one "of basic importance in our society * * * sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." M.L.B. v. S.L.J., 519 U.S. 102, 116, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996).
As to the second factor, we find a decision of the Supreme Court of Montana, in which six important functions that are served by requiring a witness' personal appearance are set forth, to be useful to our analysis. See Bonamarte v. Bonamarte, 263 Mont. 170, 866 P.2d 1132, 1134 (1994). See also State of New Mexico, ex rel. Children, Youth and Families Department v. Anne McD., 128 N.M. 618, 995 P.2d 1060, 1065 (2000) (citing with approval the six functions recognized in Bonamarte). The Bonamarte list provides that a witness' personal appearance in court:

*924 "1. assists the trier of fact in evaluating the witness' credibility by allowing his or her demeanor to be observed first-hand;
2. helps establish the identity of the witness;
3. impresses upon the witness the seriousness of the occasion;
4. assures that the witness is not being coached or influenced during testimony;
5. assures that the witness is not referring to documents improperly; and
6. in cases where required, provides for the right of confrontation of witnesses." Bonamarte, 866 P.2d at 1134.
In the instant case, several of the functions identified above were implicated, and, in our view, disregarded when Greenwald was permitted to testify by telephone. For example, the trial court was unable to determine what, if any, reports or other documents Greenwald had before her, or the extent to which she may have relied on those documents. The court was similarly unable to determine who, if anyone, was in the room with Greenwald as she testified, or to assess Greenwald's demeanor, for example that she was struggling with recollection or using evasive body language when she testified. Accordingly, we find that the risk that respondents were erroneously deprived of their parental interest, with respect to the finding under section 1(D)(m), was heightened by Greenwald's physical absence from the courtroom.
The remainder of the second inquiry under Mathews requires us to consider the probable value, if any, of additional or substitute procedural safeguards. Although the trial court expressed an intention to give Greenwald's testimony reduced weight, we do not consider such an intention, even if carried out, to be an adequate substitute for the safeguard that would have been realized had Greenwald been present in the courtroom, particularly in light of the interests at stake herein. See Santosky v. Kramer, 455 U.S. 745, 753-54, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ("[P]ersons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures").
We express our disapproval that no explanation was proffered or requested as to why Greenwald was testifying by telephone. We fail to understand why the basic procedural orthodoxy of a witness being present in open court while giving testimony was disregarded. Moreover, without information to this effect, we have no basis on which to conclude that there may have been some legitimate reason for allowing Greenwald to "phone in" her testimony. Nor are we in a position to determine whether a brief continuance would have permitted her to be present at a later date. We deem it fundamental to a proper resolution of the issue that a thorough inquiry should have been conducted. In the absence of a developed record, neither the trial court nor this court upon review can be said to be sufficiently informed that the extraordinary procedure adopted herein was justified.
The final inquiry under Mathews requires us to consider the Government's interest, including the fiscal and administrative burdens that additional or substitute procedural requirements would entail. Our supreme court recently reaffirmed its conviction that significant delays in the adjudication of parental rights impose a serious cost on the functions of the Government, as well as an intangible cost to the lives of the children involved. See In re D.L., 191 Ill.2d 1, 245 Ill.Dec. 256, 727 N.E.2d 990 (2000). We are mindful that the minors in this case had already spent 3½ years outside the custody and care of their parents, with their ultimate legal status uncertain, at the time of the unfitness hearing. See People v. R.G., 131 Ill.2d at 354-55, 137 Ill.Dec. 588, 546 N.E.2d 533 (the minor also has a private interest in his or her own well-being, and in a stable environment, which corresponds to the governmental interest). Despite the circumstance *925 that we are unable to weigh effectively these interests against any explanation that would militate against the securing of Greenwald's presence (because we are unadvised as to the reason for her absence), we are compelled to find that factor three balances in favor of the minors in this case, and thus in favor of the utmost expediency in securing their welfare. See In re Ashley K., 212 Ill.App.3d 849, 879, 156 Ill.Dec. 925, 571 N.E.2d 905 (1991).
Nevertheless, on the basis of factors one and two of the Mathews criteria, we conclude that respondents' due process rights were denied by the trial court's ruling which allowed Greenwald to testify by telephone over objection and without inquiry as to the reason for her absence. Further, we consider that because Greenwald's testimony was inadmissible, so too was the service plan upon which she commented, since no other evidentiary foundation was laid for the plan's admission. See 705 ILCS 405/2-18(4)(a) (West 1998). See also In re A.B., 308 Ill.App.3d 227, 235, 241 Ill.Dec. 487, 719 N.E.2d 348 (1999).
We reject the argument advanced by the State and Public Guardian, that telephonic testimony was proper in this case because the Act does not prohibit such a procedure. We consider that the due process concerns expressed above clearly constitute such a prohibition. We are similarly unpersuaded by the State's argument that respondents were able effectively to cross-examine Greenwald, since the effectiveness of that cross-examination was inherently limited by Greenwald's absence. See Bonamarte, 866 P.2d at 1134.
Having determined that both Greenwald's testimony and the service plan she evaluated were inadmissible, we must now consider whether the trial court's finding of unfitness pursuant to section 1(D)(m) was supported by the remaining evidence.
Section 1(D)(m) requires a parent, within 12 months after an adjudication of neglected, abused or dependent minor under the Juvenile Court Act: (1) to "make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent," or (2) to "make reasonable progress toward the return of the child to the parent." 750 ILCS 50/1(D)(m)(West 1998). Whether a parent has made reasonable progress toward the return of a child is determined objectively by the amount of movement toward the goal of reunification. In re S.O., 272 Ill.App.3d 144, 148, 208 Ill.Dec. 637, 649 N.E.2d 997 (1995). For a parent to make reasonable progress toward the return of a child, he or she must make "a minimum measurable or demonstrable movement toward that goal." In re Sheltanya S., 309 Ill.App.3d 941, 954, 243 Ill. Dec. 441, 723 N.E.2d 744 (1999), citing In re Boolman, 141 Ill.App.3d 508, 511-12, 96 Ill.Dec. 187, 491 N.E.2d 1 (1986).
Pursuant to the recent holding of our supreme court in In re D.L., when considering whether a parent is unfit under section 1(D)(m) of the Adoption Act, the "relevant period of time * * * in which the parent's efforts and progress must be assessed and measured is the 12 month period following the adjudication" of neglect, abuse or dependency. In re D.L., 191 Ill.2d at 10, 245 Ill.Dec. 256, 727 N.E.2d 990. See also In re K.B., 314 Ill.App.3d 739, 750, 247 Ill.Dec. 866, 732 N.E.2d 1198 (2000); In re J.A., 316 Ill. App.3d 553, 564, 249 Ill.Dec. 484, 736 N.E.2d 678 (2000).
In this case, an adjudication of neglect was made on July 24, 1996, thus commencing the running of the statutory 12 month period. Greenwald was the case manager from December 1996 through June 1997, and the service plan she evaluated at the hearing dated from November 1996 through June 1997. We have earlier concluded that neither Greenwald's testimony, nor her service plan were admissible. There remains, as competent evidence of reasonable progress during those 12 months, only the testimony of respondents.[3]
*926 Both respondents testified that they completed parenting classes; Gloria underwent a psychological evaluation, and Ralph participated in substance abuse treatment to some extent. Although the trial court acknowledged the foregoing evidence, the record indicates that it also relied heavily on the service plan and Greenwald's testimony in making its 1(D)(m) finding.
The evidence competent for the trial court's consideration on this issue indicates that respondents made "a minimum measurable or demonstrable movement" toward reunification (In re Boolman, 141 Ill.App.3d at 511-12, 96 Ill.Dec. 187, 491 N.E.2d 1). Thus, we determine that the trial court's finding of unfitness under section 1(D)(m) was an abuse of discretion, in that it lacked a sufficient evidentiary basis.

II. Additional Grounds of Unfitness
Despite our conclusion that the trial court's finding of unfitness under 1(D)(m) is unwarranted, we note that findings were also made under sections 1(D)(b) and 1(D)(g) as to both parents, and under 1(D)(p) as to Gloria. Respondents contend that the evidence presented at the hearing was insufficient to support these findings as well.
Preliminarily, we observe that the Illinois Adoption Act contains numerous grounds for unfitness, any one of which will support a finding of unfitness.

A.
The trial court found that both respondents failed to maintain a reasonable degree of interest, concern or responsibility as to the children's welfare under section 50/(D)(b). With respect to Ralph, the court relied on Coleman's testimony that when and if Ralph visited C.M., he would stay for only a portion of the already brief visit, and sometimes showed up after the time allotted for the visit was already expired. With respect to Gloria, the court relied on the fact that, although Gloria visited C.M. frequently, she could not seem to manage to control her inappropriate behavior, including specifically her angry outbursts, despite the fact that such behavior was profoundly upsetting to C.M. The court pointed in particular to the visit with C.M. during which Gloria threatened to bomb the house of C.M.'s foster mother, as well as Coleman's testimony that when the services recommended in the plans became "optional," neither parent utilized any services whatsoever. See In re L.M., 189 Ill.App.3d 392, 400, 136 Ill.Dec. 795, 545 N.E.2d 319 (1989), quoting In re T.R., 135 Ill.App.3d 1017, 90 Ill.Dec. 553, 482 N.E.2d 372 (1985) (the unfitness of a parent may be proven by clear and convincing evidence that they lacked any commitment necessary to complete a service plan).
On the basis of the foregoing evidence, we conclude that the trial court's findings of unfitness under 1(D)(b), with respect to both respondents, were not against the manifest weight of the evidence.

B.
Next, the court found that both respondents failed to protect their children from injurious conditions in the environment under section 50/1(D)(g). Here, the court relied in large part on respondents' history of domestic disputes accompanied by violence.
Although the plans directed that respondents cease co-habiting and that Gloria receive counseling and legal help toward the goal of separation from Ralph, both respondents admitted that they are still living together.
Ralph testified that most of the disputes occurred when he was under the influence of either drugs or alcohol, and Gloria testified that Ralph was still drinking at the time of the hearing. Further, Gloria testified *927 that now, when the couple fights, Ralph leaves the house, staying away for days and sometimes weeks at a time. In our view, this sort of erratic and unpredictable behavior does not contribute to the safety or stability of a household environment, and thus we conclude that the trial court's findings of unfitness under section 1(D)(g) were not against the manifest weight of the evidence.

C.
Finally, the court found that Gloria was unable to discharge her parental responsibilities due to mental impairment under section 50/1(D)(p). Here the court relied on the testimony of Dr. Murray, who diagnosed Gloria with a borderline personality disorder which causes her to become psychotic and/or paranoid under periods of stress. Dr. Murray opined that Gloria's personality disorder prevents her from discharging her parental responsibilities, and that this inability extends to the future, "limiting the likelihood that she would respond to treatment in any reasonable time frame." In addition to the testimony of Dr. Murray, the trial court placed some reliance on its own ability to observe Gloria's courtroom behavior, including her angry outbursts and initial refusal to testify. The court expressed concern that if Gloria was unable to control herself appropriately even in a courtroom environment, surrounded by sheriffs deputies etc., her ability to comport herself appropriately outside of that environment was dubious.
In order to find a parent unfit on the grounds of mental impairment: (1) it must be shown by competent evidence that the parent suffers from a mental disability that prevents the parent from discharging parental responsibilities; and (2) there must be sufficient justification to conclude that inability will extend beyond a reasonable period of time. In re A.J., 269 Ill. App.3d 824, 827, 207 Ill.Dec. 152, 646 N.E.2d 1239 (1994). There is ample support in the record in this case with respect to both of the above elements. The trial court's finding of mental impairment was not against the manifest weight of the evidence.

III. Best Interests of the Minors
Pursuant to a finding that it was in the best interests of the children, the trial court terminated the parental rights of both respondents, and appointed a guardian ad litem with the right to consent to the children's adoption. Respondents contend that the evidence presented during the best interests portion of the hearing did not show that severance of their ties to their children was in the children's best interests.
Because of a concern for a child's welfare, a parent's rights may be involuntarily terminated upon a finding of unfitness. See In re J.F., 248 Ill.App.3d 1, 187 Ill.Dec. 698, 618 N.E.2d 289 (1992). Once a parent has been found unfit by clear and convincing evidence, the decision to terminate parental rights rests in the sound discretion of the trial judge, and will not be reversed unless it is contrary to the manifest weight of the evidence. In re V.O., 284 Ill.App.3d 686, 690, 220 Ill.Dec. 527, 673 N.E.2d 439 (1996); In re S.H., 284 Ill.App.3d 392, 401, 219 Ill.Dec. 895, 672 N.E.2d 403 (1996).
The record reveals that at the best interests hearing, Audra Stevens, the current caseworker for C.M. testified that he has bonded extremely well with his foster mother, whom he refers to as "mom" and who loves him very much. C.M. is in special education classes, but since his foster mother hired a tutor for him, his grades have significantly improved. C.M. has learned to bathe and clean himself, has become involved in a church youth group and baseball, and has developed several friendships with other children in the neighborhood. Both C.M. and his foster mother are excited about the possibility of his adoption. Stevens stated that she believed termination of respondents' parental rights was in C.M.'s best interests, so that his foster mother could be free to adopt him.
*928 As to B.M. and E.M., Gabe Nagy, the DCFS employee who provides courtesy supervision of the girls, testified that both girls appear happy, clean and well cared for in their current foster placement. The girls interact well with their foster parents and siblings and their foster mother has expressed interest in their adoption. The girls have no interest in returning to respondents, and express anxiety and fear about the possibility of doing so. They have become involved in Girl Scouts and play baseball. Nagy stated that he believed termination of respondents' parental rights was in the best interests of B.M. and E.M. and that the girls need the stability and permanency which their foster home provides.
In light of the above evidence, we conclude that the trial court did not abuse its discretion with respect to its best interests findings, nor in entering the corresponding order that respondents' parental rights be terminated.

CONCLUSION
For the foregoing reasons, we reverse the finding of the circuit court of Cook County that respondents are unfit under section 1(D)(m), but affirm the court's findings of unfitness under sections 1(D)(g) and 1(D)(b) as to both respondents and under section 1(D)(p) as to Gloria. Finally, we affirm the court's findings with respect to the best interests of the minors, as well as the order that respondents' parental rights be terminated.
Affirmed in part and reversed in part.
HARTMAN, P.J., and HOFFMAN, J., concur.
NOTES
[1] Gloria was originally supposed to have been evaluated on April 28, 1998; however, her visit on that date was terminated due to Gloria's uncooperative and disruptive behavior. Gloria had to be escorted out of the building by sheriff's deputies.
[2] Whether Greenwald had a copy of the service plan she evaluated in front of her while she testified is unclear from the record.
[3] We note that Coleman's testimony, although similar in some respects to Greenwald's, related to the period from July 1997 to October 1998, and thus it cannot be considered to support a finding under section 1(D)(m). In re D.L., 191 Ill.2d at 10, 245 Ill.Dec. 256, 727 N.E.2d 990.