*In re* G.L. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. M.P., Respondent-Appellant).

First District (1st Division)    No. 1—00—3639

Opinion filed April 8, 2002.

Rita A. Fry, Public Defender, of Chicago (Hugh Stevens, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Jennifer Streeter, Assistant State's Attorneys, of counsel), for the People.

Patrick T. Murphy, Public Guardian, of Chicago (Charles P. Golbert and Kristin N. Wuerfel, of counsel), guardian *ad litem*.

PRESIDING JUSTICE COHEN delivered the opinion of the court:

The State filed petitions pursuant to section 2—29(2) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2—29(2) (West 1998)) seeking termination of respondent's parental rights to five of her children. Following a hearing on the State's petitions, the trial court terminated respondent's parental rights as to her two youngest children, G.L. and K.A. Respondent appeals, arguing that termination of her parental rights to G.L. and K.A. was against the manifest weight of the evidence where the trial court did not terminate respondent's parental rights to her remaining children.

## BACKGROUND

On November 20, 1995, respondent's son G.L., born August 15, 1993, was adjudicated neglected and respondent's daughter K.A., born

December 23, 1994, was adjudicated abused. Both children (along with their siblings, A.L., L.B. and J.P.) were made wards of the court on January 11, 1996. On November 23, 1999, the State filed petitions pursuant to section 2—29(2) of the Juvenile Court Act (705 ILCS 405/2—29(2) (West 1998)) seeking termination of respondent's parental rights and appointment of a guardian with the right to consent to adoption as to respondent's five youngest children: J.P., L.B., A.L., G.L., and K.A.

In its petitions seeking termination of respondent's parental rights as to G.L. and K.A., the State alleged that respondent was unfit in that she: (1) "failed to maintain a reasonable degree of interest, concern or responsibility as to the child[ren]'s welfare" (see 750 ILCS 50/1 (D)(b) (West 1998)); (2) "deserted the child[ren] for more than three months next preceding the commencement of these termination proceedings" (see 750 ILCS 50/1(D)(c) (West 1998)); (3) "failed to make reasonable efforts to correct the conditions which were the basis for removal of the child[ren] *** and/or failed to make reasonable progress toward the return of the child[ren]" (see 750 ILCS 50/1(D)(m) (West 1998));[1] and (4) "evidenced an intent to forgo [her] parental rights as manifested by her failure for a period of 12 months to (i) visit the child[ren], (ii) to communicate with the child[ren] or agency, although able to do so ***, and/or (iii) to maintain contact with or plan for the future of the child[ren]" (see 750 ILCS 50/1(D)(n) (West 1998)). The petitions further alleged that G.L. and K.A. were each residing with foster parents who wished to adopt them and that termination of respondent's parental rights was in the best interests of each child. On September 29, 2000, the trial court held a two-stage hearing to address the State's petition.

During the first stage, the trial court considered whether respondent was unfit within the meaning of section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 1998)). See 705 ILCS 405/2—29(2) (West 1998) (trial court may terminate parental rights after finding parent unfit as defined in section 1 of the Adoption Act). The State called Derryl Bolden as a witness. Bolden testified that in July 1998 he was employed by Reaching the Mark[2] and was assigned as the caseworker for respondent's family. Bolden wrote to respondent, introducing himself and informing respondent that she should contact him to arrange for services and visitation. Bolden first spoke with respondent

---

[1] The State withdrew this allegation prior to hearing on the petition.

[2] The brief filed by the public guardian explains that Reaching the Mark is a child welfare agency with which the Department of Children and Family Services had contracted to facilitate services for respondent's family.

in September or October of 1998. In that conversation, respondent told Bolden that she had phoned him on prior occasions. Bolden testified that he had never received any message that respondent had called. Bolden and respondent then "tentatively set up visits" between respondent and her children. Respondent "was supposed to actually get back in contact with [Bolden] because she didn't have a phone at that time," but "she didn't follow up with the time [she and Bolden] set aside" for visitation.

Bolden described his subsequent contact with respondent as "sporadic." Because respondent did not have a phone, Bolden asked her to call him on specific dates and at specific times. Respondent "usually wouldn't call" Bolden at the scheduled time and "would either try and follow up maybe two or three weeks later or the next time [Bolden] saw her in court." Bolden testified that between July 1998 and June 2000 he arranged for four visits between respondent and her children, but respondent attended "two at the most." Of those four visits, "the majority *** were set up after December 1999."

The State submitted several client service plans prepared by respondent's caseworkers, which were admitted into evidence. The service plan for the period January through June 1998 was prepared by Reaching the Mark caseworker Carolyn Robinson. In this service plan, Robinson rated respondent "unsatisfactory" as to both services and visitation. The plan indicated that respondent had not contacted Robinson since February 1998 despite messages and letters from the caseworker, and further indicated that respondent had discontinued her therapy sessions in March 1998. The January through June 1998 service plan also indicated that respondent had not visited with her children since either February or April 1998. Bolden prepared service plans covering the period from January 29, 1999, through July 29, 1999, and from July 29, 1999, through January 20, 2000. Each of Bolden's plans notes respondent's failure to contact him and failure to participate in services. Bolden rated respondent "unsatisfactory" as to services and visitation in both plans prepared by Bolden. In contrast, both caseworkers rated G.L.'s and K.A.'s foster mothers "satisfactory" in their care for the children.

Respondent testified on her own behalf. According to respondent, she called Bolden two days after receiving his letter, but he was unavailable. Respondent was not able to reach Bolden until around September 1998 and denied scheduling a visit during the September 1998 phone call. Respondent testified that during the two-year period that Bolden was her caseworker, she called or tried to call Bolden twice a week on average, but "sometimes *** would skip a couple weeks." Respondent testified that four visits had been scheduled since

July 1998. Respondent's eldest son (not a subject of the proceedings below) was present at the first scheduled visit; however, Bolden "never showed up with the [remaining] children." Respondent testified that she was told that Bolden was "out sick" that day. According to respondent, Bolden cancelled a second scheduled visit due to "an emergency court case." Respondent testified that Bolden scheduled a third and fourth visit, but only between respondent and her daughters J.P. and A.L. Respondent did not testify whether these two visits actually took place.

Respondent further testified that she attended an administrative case review on January 12, 2000. During that review, respondent submitted a statement complaining of difficulties with Bolden. Respondent's statement was included in the record as part of the client service plan for July 20, 1999, through January 20, 2000, and states as follows:

> "I have attempted to contact [Reaching the Mark] worker and schedule meetings in order to obtain custody of the children. I have been disregarded by Darryl [sic] Bolden and [Reaching the Mark] as an unfit parent. I have done beyond the reasonable amount of footwork to obtain visitation and return home. Court cases have been the only time (besides one face to face at his office before we went to court) I have been in contact with him is in court [sic]. Mr. Bolden has refused me visitation rights. He also refuses to cooperate with me in order to obtain a return home goal.
>
> He is purposely being unavailable so that he may obtain a no contact assumption between parent *** and children.
>
> My allegations are that in order for someone to be assessed they have to have something to be assessed about. He has never seen me interact with my children and he has not done sib visits.
>
> I request that this man be removed from my children's case because I don't really feel he has their best interest at heart."

Finally, respondent submitted certain certificates and diplomas, which were admitted into evidence, demonstrating that respondent had participated in certain services in an effort to regain custody of her children. For example, in November 1994, respondent completed a parenting class. She completed a "residential rehabilitation program" and a GED class in December 1995. Respondent completed a second parenting class in February 1996 and completed an "intensive outpatient substance abuse program" in March 1996.

The trial court found respondent unfit as to each of the five children based on "the extended period that the mother had no contact with the children." In reaching this conclusion, the trial judge noted that "[t]here was willfully [sic] inadequate evidence that the mother was somehow being denied visits." The judge further noted that the

client service plans admitted into evidence "support that the mother just stopped visiting her children."

The matter next proceeded to the second stage to determine whether termination of parental rights would be in the children's best interests. At the second stage, Joseph Bracy testified that he was employed by Reaching the Mark and was the current caseworker for the family, having been assigned to all five cases on August 25, 2000. Bracy testified that he had visited with each of the children at their respective foster homes and had spoken with each of the children about the possibility of adoption. L.B., J.P., and A.L. all expressed a desire to remain in their respective foster homes, but also wanted to be able to continue to see their mother. Bracy testified that G.L. and K.A., ages seven and five, were not able to understand adoption.

Bracy testified that he found each of the children's foster homes to be safe and appropriate. Bracy testified that G.L. was receiving special education services for attention deficit hyperactivity disorder (ADHD) and was "a grade behind" and that G.L.'s special needs were being met by his foster mother.

The trial judge found that termination of respondent's parental rights would not be in the best interests of L.B., J.P., or A.L., as each of those minors had expressed a desire to continue to see their mother. The trial judge, however, found that termination of respondent's parental rights was in the best interests of G.L. and K.A. Respondent appeals.

## ANALYSIS

■ Proceedings for the termination of parental rights may be initiated by the filing of a petition pursuant to section 2—29(2) of the Juvenile Court Act (705 ILCS 405/2—29(2) (West 1998)). *In re D.D.*, 196 Ill. 2d 405, 417 (2001). Section 2—29(2) of the Juvenile Court Act provides that a parent's rights may be terminated upon proof by clear and convincing evidence that the parent is unfit as that term is defined in section 1(D) of the Adoption Act. *In re D.D.*, 196 Ill. 2d at 417. When deciding a parent's fitness, the court is not to consider the best interests of the child but, rather, must focus on whether the parent's conduct falls within one or more of the several "grounds of unfitness" described in section 1(D) of the Adoption Act. *In re D.D.*, 196 Ill. 2d at 417. A court's determination that clear and convincing evidence of a parent's unfitness has been shown will not be disturbed on review unless it is against the manifest weight of the evidence. *In re D.D.*, 196 Ill. 2d at 417.

■ Both the State and the public guardian suggest that respondent has not challenged the trial court's finding of unfitness and that

our review is thus limited to whether termination was in the minors' best interests. We note that respondent argues only that *"termination of the mother's rights *** was contrary to the manifest weight of the evidence."* (Emphasis added.) As noted above, termination of parental rights requires: (1) a finding of parental unfitness; and (2) a finding that termination of parental rights is in the best interests of the child. By arguing that *termination* was improper, respondent does not clearly indicate whether she contests the finding of unfitness, the best interests determination, or both. Because respondent claims that the court erred in reaching a determination as to G.L. and K.A. which was different from that reached as to the older children and because the trial court found respondent unfit as to all five children, we agree with both the State and the public guardian and construe respondent's appeal as limited to a challenge of the best interests determination.

Nonetheless, even were we to review the trial court's finding that respondent was unfit, we would find no error. Evidence of a single statutory ground is sufficient to support a finding of parental unfitness. *In re D.L.*, 326 Ill. App. 3d 262, 268 (2001). Section 1(D)(n) of the Adoption Act provides that a parent may be found unfit if she "[e]vidence[d] [an] intent to forgo *** her parental rights, *** as manifested by *** her failure for a period of 12 months: (i) to visit the child[ren], (ii) to communicate with the child[ren] or agency, although able to do so ***, or (iii) to maintain contact with or plan for the future of the child[ren]." 750 ILCS 50/1(D)(n) (West 2000). Evidence was presented that respondent had not visited either G.L. or K.A. since February or April 1998, more than two years prior to the September 2000 termination hearing. Although respondent attempted to explain her lack of visitation by asserting that Bolden had denied respondent her visitation rights, the trial judge found the evidence on this point "willfully [*sic*] inadequate." The trial judge is in the best position to make factual findings and credibility assessments. *In re D.L.*, 326 Ill. App. 3d at 269. We defer to those findings here and will not reweigh evidence or reassess respondent's credibility on appeal. *In re D.L.*, 326 Ill. App. 3d at 269. Consequently, the finding that respondent was unfit was not contrary to the manifest weight of the evidence.

■ Once the trial court has made a finding of unfitness, all considerations must yield to the best interests of the child. *In re M.S.*, 302 Ill. App. 3d 998, 1003 (1999). In determining the best interests of a child in proceedings under the Juvenile Court Act, the court is required to consider a number of factors "in the context of the child's age and developmental needs." 705 ILCS 405/1—3(4.05) (West 1998). Among the factors to be considered are the development of the child's

identity, the child's sense of attachments, the child's need for permanence (which includes the child's need for stability and continuity of relationships with parent figures, siblings and other relatives), and the uniqueness of every family and child. 705 ILCS 405/1—3(4.05) (West 1998). The question of what is in the best interests of the child should not be treated lightly. *In re A.P.*, 277 Ill. App. 3d 592, 599 (1996).

The parties disagree as to the appropriate standard of review to be applied in this case. Respondent asserts that we should reverse the trial court's determination that termination of parental rights was in the children's best interests if that determination was against the manifest weight of the evidence. This standard of review has been applied by the fourth and fifth divisions of the First District of the Appellate Court (*In re C.M.*, 319 Ill. App. 3d 344, 360 (2001); *In re Sheltanya S.*, 309 Ill. App. 3d 941, 955 (1999)), as well as by the Fourth District (*In re S.H.*, 284 Ill. App. 3d 392, 401 (1996)). The State and the public guardian assert that reversal is warranted only if the trial court abused its discretion. The abuse of discretion standard has been applied by the second, third, and sixth divisions of the First District (*In re D.L.*, 326 Ill. App. 3d at 271; *In re B.S.*, 317 Ill. App. 3d 650, 664 (2000); *In re Jason U.*, 214 Ill. App. 3d 545, 550 (1991)), by the Second District (*In re M.S.*, 302 Ill. App. 3d 998, 1003 (1999)), and by the Third District (*In re D.J.S.*, 308 Ill. App. 3d 291, 295 (1999)).

■ This division has also applied the abuse of discretion standard. *In re D.H.*, 323 Ill. App. 3d 1, 13 (2001). Because a finding that is against the manifest weight of the evidence constitutes an abuse of the trial court's discretion (*Technology Innovation Center, Inc. v. Advanced Multiuser Technologies Corp.*, 315 Ill. App. 3d 238, 244 (2000)), both of the asserted standards of review are in fact applied. Thus, a trial court's decision that termination of parental rights is in a child's best interests will be reversed if the trial court's findings were contrary to the manifest weight of the evidence or if the trial court otherwise abused its discretion. *Cf. In re A.H.*, 195 Ill. 2d 408, 425 (2001) (trial court's determination of the best interests of a child in temporary custody proceedings under the Juvenile Court Act will not be disturbed on appeal absent an abuse of discretion or where the judgment is against the manifest weight of the evidence).

A trial court abuses its discretion if the trial court acts arbitrarily without conscientious judgment, exceeds the bounds of reason, or ignores recognized principles of law, so that substantial prejudice results. *Kaden v. Pucinski*, 263 Ill. App. 3d 611, 615 (1994). A decision is against the manifest weight of the evidence if the facts clearly demonstrate that the court should have reached the opposite result. *In re N.B.*, 191 Ill. 2d 338, 346 (2000).

■ Respondent contends that termination of her parental rights to G.L. and K.A. was contrary to the manifest weight of the evidence because the trial court did not terminate her parental rights to the three older children and "virtually the same evidence was presented as to the two younger children." In cases involving the termination of parental rights, each case is *sui generis* and must be decided based on the particular facts and circumstances presented. *In re D.D.*, 196 Ill. 2d at 422. Because each termination of parental rights case is unique, factual comparisons to other cases are inappropriate. *In re A.B.*, 308 Ill. App. 3d 227, 240 (1999). Indeed, in determining whether the termination of parental rights is in a child's best interest, the court must consider "the uniqueness of every family *and child.*" (Emphasis added.) 705 ILCS 405/1—3(4.05)(h) (West 1998). Clearly, the trial court's decision not to terminate respondent's parental rights as to G.L. and K.A.'s siblings does not compel an identical disposition with respect to G.L. or K.A. Indeed, the decision to terminate respondent's parental rights as to G.L. and K.A. requires consideration of the best interests of G.L. and K.A. as unique individuals. 705 ILCS 405/1—3(4.05)(h) (West 1998).

The record reflects that G.L. had been in foster care for six of his seven years of life and had been cared for by his foster mother since at least January 1998.[3] G.L.'s foster mother properly attended to his special developmental needs and wished to adopt him. The record indicates that respondent had not visited with G.L. at all from February or April 1998 until the September 2000 termination hearing. In light of this evidence, we do not believe that the decision to terminate respondent's parental rights as to G.L. was either contrary to the manifest weight of the evidence or an abuse of discretion. We therefore affirm the termination of respondent's parental rights as to G.L.

The record further reflects that K.A. was removed from respondent's custody less than two weeks after birth. K.A. was placed with her foster mother no later than January 1998.[4] The client service plans admitted into evidence at trial indicated that K.A. has a strong attachment to her foster mother and that K.A.'s foster mother wished to adopt her. As with G.L., the record indicates that respondent had

---

[3]The State's petition alleges that G.L. was placed with his foster mother on May 24, 1994; however, no evidence was presented at trial as to the initial date of placement. The client service plan for January through June 1998 reflects that G.L. had been placed with his foster mother prior to that time.

[4]The State's petition alleges that K.A. was placed with her foster mother in May 1995; however, no evidence was presented at trial as to the initial date of placement. The client service plan for January through June 1998 reflects that K.A. had been placed with her foster mother prior to that time.

not visited with K.A. at all from February or April 1998 until the September 2000 termination hearing. In light of this evidence, we do not believe that the decision to terminate respondent's parental rights as to K.A. was either contrary to the manifest weight of the evidence or an abuse of discretion. We therefore affirm the termination of respondent's parental rights as to K.A.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court terminating respondent's parental rights as to G.L. and K.A. is affirmed.

Affirmed.

McNULTY and COUSINS, JJ., concur.