NOTICE

Decision filed 10/04/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 220371-U

NOS. 5-22-0371, 5-22-0372 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* A.I. JR. and L.I., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 20-JA-113 & 20-JA-114 |
| | ) | |
| Sara H., | ) | Honorable |
| | ) | Thomas E. Little, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Moore and Wharton concurred in the judgment.

**ORDER**

¶ 1 *Held*: The trial court's findings that the respondent mother was unfit because she failed to make reasonable efforts and progress were not against the manifest weight of the evidence. Also, the trial court's finding that it was in the minor children's best interests to terminate the respondent mother's parental rights was not against the manifest weight of the evidence. Accordingly, we affirm the court's termination of the respondent mother's parental rights.

¶ 2 The respondent mother, Sara H., appeals the judgment of the circuit court of Macon County terminating her parental rights to her minor children, A.I. and L.I. On appeal, Sara H. argues that the court's findings that she was an unfit parent under sections 1(D)(b), 1(D)(m)(i), and 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(b), (m)(i), (m)(ii) (West 2020)) were against the manifest

1

weight of the evidence. She also contends that the court's best-interest finding was against the manifest weight of the evidence. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4       Sara H. and Anthony I.[1] had two children, A.I., born November 2, 2018, and L.I., born December 17, 2019. Both children were removed from the parents' home on May 21, 2020, and placed with a relative. On May 22, 2020, the State filed juvenile petitions,[2] alleging that the children were neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)) because their environment was injurious to their welfare due to the parents' ongoing domestic violence and substance abuse issues in the children's presence. The petition also alleged that the children were abused pursuant to section 2-3(2)(ii) of the Juvenile Court Act (*id.* § 2-3(2)(ii)) as their parents created a substantial risk of physical injury to them.

¶ 5       Also, on May 22, the Illinois Department of Children and Family Services (DCFS) filed a shelter care report, which indicated that the police were contacted at 11:56 p.m. on May 20, about a physical altercation between Sara H. and Anthony I. Camera footage of the altercation showed Sara H. and Anthony I. fighting in a parking lot of a motel while holding A.I. and L.I. While Anthony I. was attempting to get in a vehicle, Sara H. continued attacking him. During the altercation, an unknown bystander took A.I. from Sara H. Anthony I. reported that Sara H. struck him with a broomstick approximately 10 to 15 times. Both Sara H. and Anthony I. were arrested and had multiple injuries from the incident.

---

[1]Although Anthony I.'s parental rights were also terminated, he was not part of this appeal.

[2]The State filed the juvenile petition for A.I. in Macon County case No. 20-JA-113, which was docketed on appeal as 5-22-0371, and a juvenile petition for L.I. in Macon County case No. 20-JA-114, which was docketed on appeal as 5-22-0372. On June 21, 2022, this court entered an order consolidating the two appeals under 5-22-0371 for all purposes.

¶ 6    During the incident, the children appeared to be very dirty (the bystander wiped down A.I. because he was so dirty); Anthony I. admitted to using crack before the incident; and Sara H. was highly intoxicated and admitted to drinking but denied other drug use, even though Anthony I. said that she was using crack. There were alcohol bottles and garbage all over the floor of the motel room where they had been staying for the last month; they were being kicked out of the motel.

¶ 7    The report further indicated that DCFS had previous involvement with Anthony I. and Sara H. regarding the same issues, domestic violence and substance abuse (intensive intact services were opened on June 13, 2019). In December 2019, both Anthony I. and Sara H. tested positive for cocaine. They were considered unstable and were living in a motel after being kicked out of their previous residence for domestic violence. Although Sara H. had completed her services, the caseworker indicated that it appeared she was going through the motions as she had relapsed multiple times and continued to have domestic violence issues with Anthony I.

¶ 8    Further, on May 22, the trial court entered a temporary custody order, placing temporary custody of the children with DCFS. On June 2, 2020, DCFS prepared a family service plan, which indicated that the initial case was opened after the police responded to a domestic incident at the home. Anthony I. and Sara H. were in a physical altercation, and Sara H. scratched Anthony I. on the neck and hit him with a salsa bottle to get him away from her. Also, Anthony I. admitted to pushing her down. They were both arrested as a result of the incident.

¶ 9    According to the service plan, Sara H. was required to complete the following services: complete parenting recommendations and parenting classes; complete a substance abuse assessment; follow all recommendations and treatment plans from the substance abuse provider; complete random drug screens; complete a domestic violence assessment; follow all recommendations and treatment plans from domestic violence provider; attend all appointments

with caseworker; keep caseworker informed of any changes in address, phone number, employment, and household composition; obtain and maintain stable housing; complete a mental health assessment; and follow all recommendations and treatment plans from the mental health provider.

¶ 10　On August 12, 2020, the trial court entered an adjudicatory order, finding that the minor children were neglected in that they were in an environment that was injurious to their welfare. The court also found that the State had proven, by a preponderance of the evidence, the allegations in its juvenile petition.

¶ 11　On September 11, 2020, a dispositional hearing report was filed, which indicated that Sara H. had a bench warrant due to her failure to appear at a September 10 court hearing. Since the DCFS case was opened, Sara H. had regularly moved, continually changed her phone number, and was inconsistent with maintaining communication with her caseworker. On September 23, 2020, the trial court entered a dispositional order, finding that Sara H. was unfit and unable to care for, protect, train, educate, supervise, or discipline the minor children and that placement with her would be contrary to the children's health, safety, and best interests because of her substance abuse issues, the domestic violence issues between her and Anthony I., and the prior failed intact services.

¶ 12　On March 1, 2021, a permanency review report was filed, which indicated that Sara H. was referred to prevention and treatment services on June 18, 2020, to complete assessments for parenting, domestic violence, and anger management. She completed the assessments on August 24, 2020, and also completed the review of the treatment recommendations on September 4, 2020. Although she started all the treatment programs, she did not complete them and was discharged. On June 18, 2020, she was referred to Primed for Life for advocacy assistance, which included

assistance with housing, life skills, and employment skills, but she was also discharged from that agency. On February 18, 2021, she reengaged in prevention and treatment services. She also contacted her caseworker to be referred to Primed for Life again, and another referral was submitted on March 1, 2021.

¶ 13 As for substance abuse services, Sara H. was referred to Crossing Healthcare/Recovery Center on June 18, 2020, to complete a substance abuse assessment. She missed several appointments, never completed the assessment, and never began treatment. She was also referred to Heritage Behavioral Health Center on June 18 to complete a mental health assessment, but she never completed the assessment or any mental health services. The report indicated that, since the last court date, she had 15 random drug screens, and all of which were marked as "failure to appear."

¶ 14 On March 10, 2021, the trial court entered a permanency order, finding that Sara H. had not made reasonable progress or efforts toward returning the children home. The permanency goal was to return the children home within 12 months.

¶ 15 On May 12, 2021, DCFS filed a family service plan, which indicated that, although Sara H. was rereferred to Primed for Life for advocacy assistance and referred to Webster Cantrell Youth Advocacy (Webster Cantrell) for the nurturing parenting program, she had not participated in these services. She also had not completed her mental health, substance abuse, or domestic violence assessments; had not obtained and maintained adequate housing; had not provided any proof of income, and continued to disregard the dietary recommendations of A.I.'s primary physician by bringing inappropriate food to the supervised visits.

¶ 16 On September 1, 2021, a permanency review report was filed, which indicated that Sara H. was rated "poor" on August 31, 2021, for anger management and women's services due to her

5

sporadic attendance, lack of consistency, and lack of accountability. Also, as of August 31, she had completed 8 of the 32 sessions in the nurturing parenting curriculum and was rated unsatisfactory in parenting. Sara H. reported that she recently obtained employment and stable housing, but the caseworker had not yet completed a home safety check. On August 10, she completed a random drug screen, which was positive for delta-9-tetrahydrocannabinol (THC). She was referred for substance abuse services but was discharged in March 2021, and there was no further information as to whether she was engaging in substance abuse services. She was discharged from mental health services in July 2021 due to her lack of contact with the counselor. The recommended permanency goal was changed to substitute care pending a determination on the termination of parental rights since Sara H. was not making reasonable progress or efforts.

¶ 17 On September 8, 2021, the trial court entered a permanency order, in which the court found that Sara H. had not made reasonable efforts or progress toward the children returning home. The permanency goal was changed to substitute care pending a determination on parental rights. On September 13, 2021, the guardian *ad litem* filed a motion seeking a finding of unfitness and termination of parental rights, asserting that Sara H. was unfit under section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2020)) in that she failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare; under section 1(D)(m)(i) of the Adoption Act (*id*. § 1(D)(m)(i)) in that she failed to make reasonable efforts to correct the conditions that were the basis for the children's removal during any nine-month period after the adjudication of neglect; and under section 1(D)(m)(ii) of the Adoption Act (*id*. § 1(D)(m)(ii)) in that she failed to make reasonable progress toward the children's return during any nine-month period after the adjudication of neglect. The following were identified as the relevant nine-month time periods: August 12, 2020, to May 12, 2021; and December 10, 2020, to September 10, 2021.

¶ 18    On December 23, 2021, a permanency review report was filed, which indicated that, on October 19, Sara H. successfully completed the anger management program. Also, according to a progress report from the prevention and treatment services dated November 16, Sara H. had been consistent, on time, had taken accountability for her actions and past decision-making, and had been engaging and cooperative during the sessions. She attended 14 out of 23 appointments for parenting in the previous six months, was more consistent in her attendance since the beginning of November, and attended her last six appointments. She also completed 17 out of 32 nurturing parenting sessions and demonstrated an understanding of the material learned during the sessions. However, she was rated unsatisfactory due to her lack of progress related to her attendance. She was more consistent with completing the random drug screens, the majority of the screens were negative for everything except THC, and she reported that, as of December 1, 2021, she had been sober for eight months. She was participating in substance abuse treatment, and it was recommended that she continue engaging in those services until successfully completed. The results for her November 24 drug screen were adulterated.

¶ 19    On December 29, 2021, the trial court entered a permanency order, reiterating that the permanency goal was substitute care pending a determination on termination of parental rights. On February 17, 2022, another permanency review report was filed, in which it was noted that Sara H. was transferred to another parenting educator, but when participating in sessions with her previous educator, she seemed to struggle with organization and was forgetful, which impacted her daily life. The educator noted that Sara H. struggled with keeping appointments and regularly changed her phone number. The educator believed that Sara H.'s attendance had improved but noted that this would need to be verified with Sara H.'s current educator. Sara H. was still working on the first edition curriculum because of her attendance issues, but, based on her responses during

7

the sessions, she seemed to be learning. She was more consistent with her random drug screens and tested negative for everything but THC. The caseworker who prepared the report indicated that, although Sara H. had engaged in services, the application of some of the services had not been consistent.

¶ 20     On April 26, 2022, a best-interests report was filed, which indicated that the children were placed in a relative's home and that they were very active and played around the house. A.I. was well adjusted in the home and seemed to enjoy interacting with his foster family. He had recently started daycare and was adjusting to the daycare schedule. L.I. was beginning to talk more and tended to follow the lead of his older brother, attempting to do all of the things that A.I. was doing. He also recently started daycare and seemed to enjoy it and also seemed to enjoy interacting with his foster family. The foster parents were adamant about ensuring that the children's needs were met; they had taken the necessary steps to become a licensed foster home; and they were committed to providing a permanent, loving, and stable home for the children. The caseworker had no doubts about the family's ability to ensure the children's health, safety, and well-being.

¶ 21     At the March 28, 2022, fitness hearing, the following testimony was presented. Shelly Pinkston, a behavioral substance abuse counselor at Crossings Healthcare, testified that Sara H. initially began outpatient services in August 2021. Although Sara H. participated during group sessions, her attendance was sporadic. She attended less than one-half of the appointments for group and individual treatment, and, although she made some progress in her treatment, her inconsistent attendance hindered her performance in the program. She also had a mental health assessment that was on hold for months because she did not come in to complete it; she eventually completed the assessment in February 2022. Pinkston believed that Sara H. was trying to succeed in the program and noted that she kept coming back to treatment.

8

¶ 22    Alison Bickel, a parenting educator with Webster Cantrell, testified that Sara H. first became involved with parenting services on May 5, 2021. On that date, Sara H. completed a parenting assessment and was rated a medium risk in all five areas. Based on the assessment results, the recommendation was for Sara H. to initially meet weekly for approximately one hour to review the Illinois nurturing parenting curriculum. That particular curriculum consisted of 32 sessions. Sara H. did not successfully complete the curriculum due to attendance; between May 2021 and January 2022, she attended 20 out of the 32 sessions. From May 2021 to September 2021, Sara H. had two cancellations (one for being sick) and seven no shows.

¶ 23    Bickel explained that, if Sara H. had completed the nurturing parenting curriculum, she would have been given a post-assessment to determine the next recommendation, but Bickel noted there was a good chance that the next recommendation would have been for the protective factors' curriculum. Throughout the program, Sara H. was consistently rated as unsatisfactory for lack of attendance. There was also an issue with Sara H. not following A.I.'s dietary restrictions. However, Bickel acknowledged that, when in classes, Sara H. would participate in discussions, and she was making some effort to become a better parent, but there was limited progress.

¶ 24    Vicki Brown, a supervisor at Webster Cantrell, testified that she has been involved in the visitation between Sara H. and the minor children since March 2021. Sara H. attended the majority of the visits with the children; she only missed a few. There was an issue with her providing food that was not appropriate for A.I. because he needed gluten-free food, but, after the concern was addressed with her, she started bringing appropriate food.

¶ 25    Jennifer Cooper, a foster care supervisor at Webster Cantrell, testified that she was the caseworker in this case from June 2020 until July 2021. She recommended the following services for Sara H.: parenting, substance abuse, domestic violence, anger management, cooperation and

9

communication, housing, and mental health. During this time period, Sara H. was rated unsatisfactory on all of the service plan tasks due to lack of attendance, failure to appear, and not following recommendations. Cooper explained that Sara H. was not following recommendations in that she was not following the assessments and was not cooperating or communicating with the agency.

¶ 26    Cooper initially referred Sara H. for parenting services on June 18, 2020, but Sara H. was discharged from those services in 2020. She also referred Sara H. to Crossing Healthcare for a substance abuse assessment, but Sara H. missed several appointments and did not complete the assessment or any treatment. She was also asked to do 15 random drug screens, and they were all marked as failure to appear. However, Cooper acknowledged that, for some of the drug screens, they had attempted to contact Sara H. to inform her of the screen, but they were unable to contact her. Cooper also acknowledged that one of the difficulties for Sara H. completing the drug screens was that Sara H. was required to show photo identification. However, Cooper assisted Sara H. in obtaining the identification.

¶ 27    Sara H. was also discharged from domestic violence and anger management services, but, on February 18, 2021, she did contact the service provider to reengage in those services. She also did not complete her mental health assessment. She was discharged from services through Primed for Life, but she asked to be rereferred to that agency, and Cooper submitted another referral in March 2021. During Cooper's time as the caseworker, Sara H. never successfully completed a service plan. However, Cooper had no knowledge as to what services Sara H. completed after July 2021. Cooper also testified that, although Sara H. would contact the agency, it was difficult to reach her, and there were multiple times where she would give them a phone number, but then

10

her phone was lost or damaged. Sara H. reported that she was living with her mother, but there were also reports that she was living with a friend.

¶ 28    Laporshia Graves, a foster care caseworker for Webster Cantrell, testified that she took over the case from Cooper on July 13, 2021, and that she was the current caseworker. From July 13, 2021, until mid-September 2021, Sara H. had not completed any of the tasks on her service plan and had not made any progress toward returning the minor children home. However, Graves did have regular communication with Sara H. during that time period. On August 10, 2021, Sara H. submitted to a random drug screen and only tested positive for THC.

¶ 29    Graves drafted the September 2021 permanency report, in which Sara H.'s progress with anger management was rated as poor due to her sporadic attendance and lack of consistency and accountability. Sara H. was rated unsatisfactory for parenting because, at that time, she had only completed 8 out of the 32 sessions in the nurturing and parenting curriculum. She was referred to Crossing Healthcare but was discharged in March 2021. There was no other information as to whether she had completed any other substance abuse services. She was also discharged from mental health services in July 2021 due to lack of contact with the counselor.

¶ 30    Sara H. testified that, since she started engaging in services in August 2021, six classes were canceled by the agency. When she asked if she could make up the classes, she was told that she could not because they could only meet with her once per week. She explained that issues arising out of the pandemic and canceled classes delayed her ability to complete the required services. She acknowledged that she was not easy to contact in the beginning because she changed her phone number a lot, but in the last seven months, there had been no issues with contacting her. She also explained that she had issues completing the random drug screens because she was required to have photo identification. However, she worked with the agency to fix that issue.

11

¶ 31     Sara H. successfully completed a 16-week anger management course on October 19, 2021. She also completed a 25-week women's services program through prevention and treatment services on December 28, 2021. She independently completed two different parenting courses that were not included in her service plan. However, she did not sign up for those courses until February 2022. Based on the services that were still in progress in her service plan, she believed it would take her nine weeks to complete all of the remaining tasks in her plan. She was engaged in every service that was part of her plan.

¶ 32     After hearing the testimony, the trial court found that the State had proven, by clear and convincing evidence, that Sara H. was an unfit parent in that she failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare and failed to make reasonable progress and efforts for the return of the children during any nine-month period following the court's adjudication of neglect. In making this decision, the court addressed Sara H.'s testimony that she believed she could complete all of her service plan tasks within nine weeks and found that the testimony was not realistic and that it was "simply too little too late."

¶ 33     At the June 13, 2022, best interests hearing, Cooper testified that the minor children had been in DCFS care since May or June 2020. The children appeared to be doing well in their foster home, they had been in the same home since placement, they were well adjusted, and they had formed attachments to their foster parents. The family became a licensed foster home, and they displayed a commitment to ensuring the health, safety, and well-being of the children. Cooper believed that it was in the children's best interests to continue in their current placement and have permanency. However, she acknowledged that the last time she had personal involvement in the case was October 2021.

¶ 34    Corrina Hosto, a foster care case manager with Webster Cantrell, testified that she was the children's current foster care caseworker and had been their caseworker since the beginning of May 2022; she replaced Graves. She also believed that it would be in the children's best interests to remain in their current placement so they could have permanency. She observed the children two or three times in their current placement and noted that they were doing well. Based on the interactions that she observed between the children and the foster family, she had no concerns with the children being placed there. A.I., who was three years old at the time, was in daycare, and he did really well there. Hosto noted that he was a very smart little boy. L.I., who was two years old at the time, was also placed in the same home. Hosto observed that they loved each other, were affectionate toward each other, and were both very sweet, happy boys. They were both attached to their foster parents and seemed to love them very much.

¶ 35    The parents were both employed full-time, they had childcare set up for the children while at work, they were constantly with the children when not at work, they provided the children with everything they needed, and the children were safe in the home. On one visit, Hosto observed that the children were very excited for their foster father to come home after work. The children had started calling them "mom" and "dad" and were affectionate toward them. A.I. was always saying how he loved his foster mother. Hosto acknowledged that she had never met Sara H.

¶ 36    Sara H. testified that she had been trying to contact the current caseworker; she called the office and even went there in person. However, she had not talked to the current caseworker and had not seen the children since May 16. She currently owned her own home where the children had their own furnished bedrooms. She had full-time employment at Burger King.

¶ 37    After hearing the testimony, the trial court found that, after reviewing the best-interest factors, the State had proven, by a preponderance of the evidence, that it was in the children's best

13

interests that the parental rights of Sara H. and Anthony I. be terminated. In deciding, the court noted that the most relevant factors were where the children felt a sense of attachment, love, security, familiarity, and continuity. The court also noted that another relevant factor was the children's need for permanency, which included their need for stability and continuity of relationships with parental figures, with siblings, and with other relatives. The court further noted that the best-interests report indicated that the children had been placed in a relative foster care placement, they were well adjusted in that home, they enjoyed interacting with their foster family, and the foster parents ensured that all of the children's needs were being met and completed everything that the agency required of them. The parents were committed to providing a permanent, loving, and stable home for both children, and there was no doubt about their ability to ensure the health, safety, and well-being of both children.

¶ 38    The trial court noted that the testimony demonstrated that the children loved each other, were very attached to their foster parents, were happy, and were living in a safe environment. The children had also spent almost their entire lives with this foster family. The court found that Sara H.'s testimony that she was unable to contact the caseworker was not credible.

¶ 39    On June 14, 2022, the trial court entered a judgment as to parental fitness and permanent termination, finding that Sara H. was unfit in that she failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare and failed to make reasonable progress and efforts for the return of the children during any nine-month period following the court's adjudication of neglect. The court identified two relevant nine-month periods: August 12, 2020, to May 12, 2021; and December 10, 2020, to September 10, 2021. The court also found that termination was in the children's best interests. Sara H. appeals the fitness findings as well as the best-interest determination.

¶ 40                                    II. ANALYSIS

¶ 41                            A. Fitness Determination

¶ 42    Sara H. first contends that the trial court's finding that she was unfit was against the manifest weight of the evidence.

¶ 43    Termination of parental rights proceedings are governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)). *In re D.F.*, 201 Ill. 2d 476, 494 (2002). A petition to terminate parental rights is filed under section 2-29(2) of the Juvenile Court Act, which delineates a two-step process in seeking to terminate parental rights involuntarily. 705 ILCS 405/2-29(2) (West 2020). It must first be established, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds of unfitness enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). 705 ILCS 405/2-29(2), (4) (West 2020); *In re D.F.*, 201 Ill. 2d at 494-95.

¶ 44    Our courts have recognized that parental rights and responsibilities are of deep importance and should not be terminated lightly. *In re C.P.*, 191 Ill. App. 3d 237, 244 (1989). Thus, parental rights may be terminated only after a finding of unfitness that is supported by clear and convincing evidence. *In re Gwynne P.*, 346 Ill. App. 3d 584, 590 (2004). The burden of presenting clear and convincing evidence of unfitness is on the party petitioning for adoption. *In re Adoption of L.T.M.*, 214 Ill. 2d 60, 67-68 (2005). A finding of parental unfitness will not be disturbed unless it is against the manifest weight of the evidence. *In re D.D.*, 196 Ill. 2d 405, 417 (2001). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *In re C.N.*, 196 Ill. 2d 181, 208 (2001).

¶ 45    A trial court's finding of unfitness is given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App.

15

3d 1052, 1064 (2006). A reviewing court, therefore, does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Each case is unique and requires a close analysis of its individual facts. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 19.

¶ 46    Here, the trial court found Sara H. unfit on the following three grounds: (1) she failed to maintain a reasonable degree of interest, concern, or responsibility for the minor children's welfare; (2) she had not made reasonable efforts to correct the conditions that led to the removal of the minor children from her care during any nine-month period following the adjudication of neglect; and (3) she had not made reasonable progress toward the return of the children during any nine-month period following the adjudication of neglect.

¶ 47    A reviewing court may affirm the trial court's judgment where the evidence supports a finding of unfitness as to any one of the alleged grounds. *In re Tr. A.*, 2020 IL App (2d) 200225, ¶ 43. As we affirm the trial court's determination that Sara H. was unfit on the basis of her failure to make reasonable efforts to correct the conditions that led to removal and reasonable progress toward the return of the minor children to her care, we do not address the remaining basis for the trial court's unfitness finding.

¶ 48    Reasonable efforts and reasonable progress are two distinct grounds of unfitness under section 1(D)(m). *In re Daphnie E.*, 368 Ill. App. 3d at 1066. Reasonable efforts relate to the goal of correcting the conditions that caused the removal of the children and are judged by a subjective standard based upon the amount of effort that is reasonable for a particular person. *In re P.S.*, 2021 IL App (5th) 210027, ¶ 34. For reasonable efforts, the trial court must determine whether the parent has made earnest and conscientious efforts toward correcting the conditions that led to the removal of the minor children from the home. *Id.*

16

¶ 49    In contrast, reasonable progress is judged using an objective standard that focuses on the amount of progress toward the goal of reunification one can reasonably expect under the circumstances. *In re C.M.*, 305 Ill. App. 3d 154, 164 (1999). Reasonable progress is measured from the conditions existing at the time of removal. *In re P.S.*, 2021 IL App (5th) 210027, ¶ 37. It requires, at a minimum, measurable or demonstrable movement toward the goal of reunification. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. The standard by which progress is measured is the parent's compliance with the court's directives and the service plans in light of the conditions that gave rise to removal and other conditions that later become known and would prevent the court from returning custody of the child to the parent. *Id*. There is reasonable progress when the court can conclude that it will be able to return the children to parental custody in the near future. *Id*.

¶ 50    The trial court identified two nine-month time periods that were relevant for the fitness determination: August 12, 2020, to May 12, 2021; and December 10, 2020, to September 10, 2021. Sara H. contends that her efforts were reasonable for someone in her position as issues arising from the pandemic, issues with her phone, and canceled classes delayed her ability to complete the required services. Despite these roadblocks, she successfully completed 16 weeks of anger management, completed women's services, and independently completed two different parenting courses. She also made progress in her substance abuse treatment and was consistent with visits. Further, there was testimony from the foster care case manager that, if Sara H. put in the effort, she would be able to complete the service plan. Thus, she argues that the trial court's findings of unfitness based on reasonable progress and reasonable efforts were against the manifest weight of the evidence.

¶ 51    The minor children were taken into care in May 2020 when the police were called to a local motel parking lot because Sara H. and Anthony I. were in a physical altercation while holding the minor children. Even though Sara H. denied that she had used drugs before this incident, she was highly intoxicated, and Anthony I. claimed that she was using crack. There was a history of domestic violence involving the family, and this was not the first time that DCFS was involved because of their domestic violence and substance abuse issues.

¶ 52    Sara H.'s service plan tasks consisted of parenting classes, substance abuse services, completion of random drug screens, domestic violence services, mental health services, obtaining and maintaining stable housing, and keeping the caseworker informed of changes in address and phone number. Although Sara H. successfully completed an anger management course in October 2021, her initial intake for anger management services was completed in June 2020. She also completed women's services in December 2021, but, like the anger management services, she had not completed those services within the relevant time periods.

¶ 53    During the pertinent time periods, she was rated "poor" on August 31, 2021, for anger management and women's services due to her sporadic attendance, lack of consistency, and lack of accountability. She was also rated unsatisfactory for parenting for only completing 8 of the 32 sessions in the nurturing parenting curriculum. Sara H. was referred for substance abuse services but was discharged in March 2021 and failed to appear for her random drug screens. She was discharged from mental health services in July 2021 due to her lack of contact with the counselor. She did not complete a mental health assessment until February 2022.

¶ 54    We recognize that, at the time of the fitness hearing, Sara H. was engaging in services and making some effort to correct the conditions that led to the minor children's removal. However, as stated by the trial court, these efforts were simply too little, too late. Sara H. did not have an

18

unlimited amount of time to make reasonable progress or efforts toward regaining custody of her minor children. See *In re D.J.*, 262 Ill. App. 3d 584, 591 (1994). Given the above evidence, the circuit court's findings that Sara H. failed to make reasonable progress and reasonable efforts during the relevant nine-month time periods were not against the manifest weight of the evidence.

¶ 55                                    B. The Best-Interests Determination

¶ 56    If the trial court finds that the parent is unfit, the matter proceeds to a second hearing, at which it must be proven that termination of parental rights is in the best interests of the child. 705 ILCS 405/2-29(2) (West 2020); *In re D.F.*, 201 Ill. 2d at 495. Following a finding of parental unfitness, the focus shifts entirely to the child. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). At the best-interests stage, all considerations must yield to the best interests of the child and the parent's interest in maintaining a parent-child relationship yields to the child's interests in a stable, loving home life. *Id*. The State has to prove the child's best interests by a preponderance of the evidence. *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 80.

¶ 57    In reaching a best-interests determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural, and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 52; see also 705 ILCS 405/1-3(4.05) (West 2020).

¶ 58    However, the trial court's best-interests determination does not have to contain a specific reference to each of the statutory factors. *In re Tr. A.*, 2020 IL App (2d) 200225, ¶ 58. The decision to terminate parental rights rests in the sound discretion of the trial court and will not be reversed unless it is contrary to the manifest weight of the evidence. *In re C.M.*, 319 Ill. App. 3d 344, 360, (2001).

¶ 59    Here, Sara H. contends that the trial court's finding that termination of her parental rights was in the minor children's best interests was against the manifest weight of the evidence. Specifically, she argues that she owns a home, is employed, and is more than capable of caring for her children. She also argues that it would be in the children's best interests to grow up with their mother who loves them and has fought for them.

¶ 60    Considering the above best-interest factors, we disagree with Sara H. and conclude that the trial court's best-interests determination was not against the manifest weight of the evidence. The children, who were ages three and two at the time of the best-interests hearing, had been living with their foster family since May or June 2020. The foster parents were relatives of the children; they ensured that all of the children's needs were met; and they were committed to ensuring the children's health, safety, and well-being. They also provided the children with stability; permanency; and a safe, loving home. The children referred to their foster parents as "mom" and "dad," they were affectionate toward them, and they were well adjusted in the home. The children were also attached to each other and were doing well in daycare. Given the above, we conclude that, after considering the statutory factors, the trial court's determination that it was in the minor children's best interests to terminate Sara H.'s parental rights was not against the manifest weight of the evidence.

¶ 61                                    III. CONCLUSION

¶ 62    For the foregoing reasons, we affirm the judgment of the circuit court of Macon County.


¶ 63    Affirmed.