NOTICE
Decision filed 09/22/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250344-U

NOS. 5-25-0344, 5-25-0345, 5-25-0346 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* CALLAN M., MOLLY M., and CAEDYN M., Minors | ) ) ) | Appeal from the Circuit Court of Saline County. |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | Nos. 22-JA-30, 22-JA-31, 23-JA-11 |
| Thomas M., | ) ) ) | Honorable Amanda Byassee Gott, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Boie and Vaughan concurred in the judgment.

**ORDER**

¶ 1   *Held*: Where the evidence supported the circuit court's findings that Father was unfit and that the children's best interests required terminating his parental rights, we grant appointed appellate counsel leave to withdraw and affirm the circuit court's orders.

¶ 2   The respondent, Thomas M. (Father), appeals the orders entered by the circuit court of Saline County on April 4, 2025, that terminated his parental rights as to his biological children, Molly M. (born September 2017), Callan M. (born November 2019), and Caedyn M. (born March 2023). Father's appointed counsel on appeal has concluded there is no reasonably meritorious argument that the circuit court erred in entering the April 4, 2025, orders. Appointed counsel has filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), and a supporting

1

memorandum. Counsel notified Father of the motion to withdraw. This court has provided Father with ample time to respond to counsel's motion and memorandum; however, he has not responded. After considering the record on appeal, counsel's motion, and the supporting memorandum, we agree with counsel that there are no arguably meritorious issues to be considered on appeal. Accordingly, we grant counsel leave to withdraw and affirm the circuit court's orders.

¶ 3                                                    I. BACKGROUND

¶ 4      This consolidated appeal involves three juvenile cases from the circuit court of Saline County with both Father and Alexandria W. (Mother)[1] as respondents. The juvenile cases regarding Molly M., 22-JA-30, and Callan M., 22-JA-31, began with the filing on June 28, 2022, of petitions[2] for adjudication of wardship. The juvenile case regarding Caedyn M. was originally filed in the circuit court of Jefferson County on March 10, 2023, when Caedyn was days old. The case regarding Caedyn was later transferred to the circuit court of Saline County as case No. 23-JA-11.

¶ 5      The petitions for adjudication of wardship for Molly and Callan contained the same allegations of abuse and neglect. The petitions alleged the minors were abused pursuant to section 2-3(2)(i) and (ii) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(2)(i), (ii) (West 2020)). In support, the petition alleged, *inter alia*, that on or about June 25, 2022, the Department of Children and Family Services (DCFS) was called to investigate a domestic violence incident after reports that a law enforcement officer heard screaming coming from the residence where the children resided. The officer heard arguing and a child screaming, "stop you are hurting me." The petitions further alleged the following:

---

[1]Alexandria W. is not a party to the present appeal, and has brought her own cases on appeal.
[2]In addition to the juvenile petitions filed regarding Molly and Callan, juvenile cases were also opened regarding Mother's other children Avery W., 22-JA-28, and Clinton F., 22-JA-29; however, these cases are not part of the present appeal.

"The DCFS investigator subsequently had the minors examined in the emergency room and minors[3] were found to have bruises, including one minor sustaining a black eye, another child with bruises all over minor's legs in various stages of healing and another child with bruises on her arm consistent with fingerprints. The oldest minor disclosed to DCFS that her mother had grabbed her on her arm while mother was under the influence of intoxicating substances and explained that is how she sustained the bruises. One minor disclosed to DCFS that mother slaps him in the face on a regular basis and pulls his hair."

¶ 6    The petitions alleged the minors were neglected by virtue of being in an environment injurious to their welfare pursuant to section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)). In support, the petitions alleged in May 2022, DCFS had received reports of alleged sexual abuse to one of the minors[4] by a family or household member of the mother; domestic violence incidents were occurring in the household; and substance use issues by Mother. The petitions also alleged the minors were neglected by virtue of being in an environment injurious to their welfare pursuant to section 2-3(1)(a) of the Act (*id.* § 2-3(1)(a)). On June 25, 2022, DCFS investigators found the home in "deplorable conditions [*sic*], with trash and rotten food scattered throughout the home." The bedroom shared by two minors had piles of trash and clothes. The minors were also found to have black and soiled feet, and one minor had a soiled diaper and a prominent diaper rash.

¶ 7    At a shelter care hearing held that same day, DCFS investigator Stephanie Dutton testified that she was called to investigate a domestic violence report at the home Father shared with his own father, and where Mother "had previously been staying with the children." A neighbor had called police to report "screaming and yelling" inside the house. When Dutton knocked on the

[3]The petition did not specify which minor sustained the referenced injuries.
[4]The petition does not specify which minor was allegedly abused nor the alleged perpetrator(s).

door, Father initially did not answer. When he finally opened the door, she found the home in "deplorable" condition, and the "two youngest [children] were laying on the floor in the filth."[5] Dutton found bugs everywhere. The children said that they had not eaten all day because it was impossible to cook in the home.

¶ 8    Dutton testified that Clinton reported being smacked in the face daily and being grabbed by his hair. Avery showed Dutton bruises that were consistent with finger marks. Callan had a scrape from the top of his face and down the entire side of his face. Dutton was told that Mother had Molly and Callan in a stroller near a restaurant when she tripped, staggered, and fell down an embankment. Mother was under the influence of substances to such an extent she did not realize she had rolled over Callan with the stroller.

¶ 9    Aware that an order of protection forbade Father from being around the children, she took them into protective custody. She took the children to a hospital, and after they were cleaned, hospital staff discovered "marks and bruises throughout their bodies." The court granted the State's request for shelter care, finding probable cause to believe that the children were abused and neglected as alleged in the petition. The court further found there was an immediate and urgent necessity for the children to be removed from their parents and placed in DCFS's temporary custody.

¶ 10    A family service plan filed on September 1, 2022, noted that caseworker Toni Furlow had spoken to Father while he was incarcerated in Saline County jail for violation of a bail bond on July 11, 2022, and domestic battery. Father denied abusing the children and Mother. He did not admit that the home was not safe for the children, "[t]aking no responsibility for his actions or the

_____

[5]Also in the home were two older children who are not parties to this appeal.

4

DCFS involvement." Father did understand that he needed to complete services after Furlow "explained the process."

¶ 11  On October 18, 2022, the court convened the adjudicatory hearing. Both parents stipulated to the allegations in the petitions, and the cases were set for a dispositional hearing. The dispositional hearing was conducted on November 15, 2022. Father agreed with the proposed dispositional order from the State finding him unfit and unable to care for the minors. He stipulated to same, waiving his right to a hearing. The dispositional order was entered and a permanency hearing was scheduled for April 11, 2023.

¶ 12  A family service plan was filed on December 20, 2022, which noted that Father had been released from jail. While incarcerated Father had not completed services, so his progress in completed services was considered unsatisfactory.

¶ 13  On March 8, 2023, Mother gave birth to Caedyn M. A petition for adjudication of wardship was filed regarding Caedyn on March 10, 2023. The petition alleged the minor was neglected by virtue of being in an environment injurious to his welfare pursuant to section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)). In support, the petition alleged Mother has ongoing alcohol and substance abuse issues that prevent her from being able to care for and protect a newborn; Mother and Father have a prior history of DCFS involvement with indicated reports from 2018 (Mother), 2019 (Mother and Father), 2022 (Mother), and 2022 (Mother and Father); and Mother and Father have two other children that are currently in the care and custody of DCFS and have failed to correct the conditions that brought those children into care.

¶ 14  A DCFS permanency report to the court was filed on April 10, 2023. The report stated that Father had maintained contact with the agency, had completed a mental health assessment, and attended probation. Father had not completed domestic violence classes, parenting classes, or

substance abuse classes. DCFS considered him to be making reasonable efforts, but not satisfactory progress. DCFS recommended permanency goal was return home within 12 months.

¶ 15    At the April 11, 2023, permanency hearing, the State recommended a finding that Father had made neither reasonable efforts nor reasonable progress. Father's counsel disagreed, noting that since his release from jail, Father had undertaken substance abuse and mental health treatment. His counsel stated that he would soon be discharged from the former, and had recently begun domestic violence classes. Caseworker Furlow agreed that Father had "made some progress since he's been released from county jail, and he is making efforts now," while indicating that he had been on waiting lists for some services. She noted that Father had visited the children regularly and engaged with them.

¶ 16    The court acknowledged that Father had made some efforts since his release from jail but declined to categorize them as reasonable. The court found no substantial progress, however. The court set the permanency goal as return home within 12 months.

¶ 17    On May 22, 2023, an adjudicatory order was entered in Caedyn's case finding him neglected. A dispositional order was entered regarding Caedyn on June 15, 2024, finding Father unable to care for him. On August 14, 2023, Caedyn's case was transferred from the circuit court of Jefferson County to the circuit court of Saline County where the cases for Molly and Callan were pending.

¶ 18    Subsequent family service reports noted that Father, while nominally engaged in required services, was not participating in good faith. He engaged in mental health treatment but "states that it is a joke." He had started substance abuse classes "but states that he does not need this recommendation." Further, a report described him as speaking in a "threatening and intimidating

6

manner to an agency staff member with negative connotations during visits with his children as well as in court proceedings and [administrative case reviews]."

¶ 19    A September 8, 2023, permanency report concluded that both parents "have completed recommendations like a check list." The report noted that on August 11, 2023, Father tested positive for alcohol at 8:30 a.m. Father canceled three visits with the children and ended six of them early.

¶ 20    At the September 12, 2023, permanency hearing, the State recommended a finding of reasonable efforts and substantial progress by both parents and proposed a goal of return home in 12 months. It stated that Father had nearly completed his services, and that the only reason the return home goal had not been achieved was that visitation needed to be increased. The court disagreed with those statements and invited the guardian *ad litem* (GAL) to comment. The GAL disagreed with the recommendations "based on the permanency report." She further questioned the recommendation of increasing visitation given that the parents frequently missed visits or ended them early.

¶ 21    Father's counsel noted that father had completed all his services. She contended that Father's missed or shortened visits were due to factors beyond his control such as work. The court found reasonable efforts but not substantial progress.

¶ 22    A November 27, 2023, permanency report stated that the agency had not had contact with Father since September 12, 2023, despite multiple attempts to contact Father in person and by telephone. Although he had completed most services, he continued to believe that the services were a "joke." He missed numerous drug tests in the preceding two months, appearing for only one, on September 28, which was negative.

¶ 23    At the December 12, 2023, permanency hearing, the court noted that the permanency report requested a goal change to substitute care pending termination of parental rights while at the same time finding that the parents had made reasonable efforts and progress. Furlow explained that she had checked the wrong box, and she was not requesting a goal change. Regarding Father's progress, Furlow reported that Father had recently submitted to a drug screen (possibly referring to the negative test on September 28). He had agreed to engage in substance abuse classes again, although he refused to sign a consent. Furlow also recommended that Father attend parenting classes again due to issues that had arisen during visits. The court continued the hearing to allow for the preparation of a new permanency report.

¶ 24    An updated permanency report was filed on January 30, 2024, with the stated goal of returning the minors home. At the continued permanency hearing on February 13, 2024, Furlow testified that, because of a positive test for alcohol in September, she had requested Father to retake substance abuse classes, to which he refused. He had not drug tested since the last court date. Father had completed domestic violence classes. Furlow requested that Father retake parenting classes, given that he threatened to spank one of the children during visitation and was otherwise "inappropriate during visitation time." On cross-examination, however, she conceded that Father was "generally appropriate" during visitations except for that incident.

¶ 25    The court noted that he had not complied with drug testing, had tested positive for alcohol in the morning, refused to test thereafter, and had refused to redo parenting and substance abuse classes. The court found that Father had not made reasonable efforts or reasonable progress. The goal remained return home within 12 months.

¶ 26    An April 23, 2024, permanency report stated that Father exhibited "explosive behaviors" at a recent visitation. He "cursed in front of the child and used vulgar language" toward agency

8

personnel. Later that day and into the following morning, the caseworker received 13 text messages and 8 phone calls from Father, "cussing out worker and [her] supervisor." The report recommended changing the goal to substitute care pending a decision to terminate parental rights.

¶ 27    A family service plan filed April 25, 2024, indicated that Father made unsatisfactory progress towards his domestic violence, parenting, mental health, and substance abuse recommendations. He made satisfactory progress regarding cooperating with probation.

¶ 28    A permanency hearing was held on May 14, 2024. Father had completed a second round of parenting classes as recommended; however, he had not completed substance abuse classes and refused a drug screen on May 2, 2024. The court maintained the goal as return home and found Father had made reasonable efforts but not substantial progress.

¶ 29    A permanency report was filed on July 30, 2024, which noted Father had completed classes but was not applying what he learned. Father was scheduled for three drug screens in July, but only appeared for one. A permanency report filed on September 4, 2024, noted that at a visit, on August 29, 2024, Callan was crying and inconsolable for nearly 20 minutes during a parental visit. A case assistant noted that Father had been encouraging Callan's behavior, saying things like, "This is what happens when you take peoples' kids from them." Father then shoved Callan off of his lap after he would not stop crying. The case assistant was concerned that Father had been aggressive to female case aides in the past and she had concerns for her safety while ending the visit. Father reportedly threatened the staff at the office where the visit occurred. Further, Father and Mother "trashed" the office, leaving crumbs and wrapping paper throughout. The September 10, 2024, permanency order maintained the goal of return home. It found Father made reasonable efforts, but not substantial progress.

9

¶ 30　A permanency report was filed on November 13, 2024. At this time, Father was not engaging in the recommended services for domestic violence, parenting, mental health, anger management, and substance abuse. Father continued to miss toxicology screenings. At this time, the case had passed DCFS legal screening and the agency recommended changing the goal to substitute care pending termination of parental rights. The permanency order entered on November 26, 2024, found father had not made reasonable efforts nor substantial progress. The goal was changed to substitute care pending termination of parental rights.

¶ 31　On January 13, 2025, the State petitioned to terminate Father's parental rights. The State alleged that he had failed to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare; protect them from conditions injurious to their welfare; make reasonable efforts to correct the conditions leading to their removal between October 19, 2022, and July 18, 2023; July 19, 2023, and April 19, 2024; and April 20, 2024, through the date of the petition's filing; and to make reasonable progress towards the children's return during the same periods. The State further alleged that Father had abandoned and deserted the children.

¶ 32　A January 22, 2025, permanency report found Father's progress unsatisfactory for all his recommended services. Further, it noted that Father missed three drug tests. Following the last one, he told the caseworker that "we're done doing business with you. You have made it clear that all you want us to do these bullshit classes and trips to Marion [for drug testing] while robbing us of our children's rights. We're done with it."

¶ 33　The same report noted that, subsequently, the caseworker spoke to Father on the telephone, who became hostile and argumentative, and sounded intoxicated. When Father hung up abruptly, the caseworker called the sheriff to conduct a welfare check. Afterward, Father called the executive director of Lutheran Social Services of Illinois (LSSI) expressing anger that the welfare check had

been requested. The director also believed Father to be intoxicated or impaired. Father then sent multiple text messages to the caseworker and made repeated calls to LSSI's after-hours answering service, threatening the caseworker and staff. He reportedly threatened to kill the caseworker and "everyone at Lutheran."

¶ 34    On February 4, 2025, the court held a permanency hearing as well as the first appearance on the motion for termination. A permanency report filed on March 18, 2025, again found Father unsatisfactory on all services, and missing more drug screens.

¶ 35    On April 1, 2025, the court held the termination of parental rights hearing. Nathan Smith, the current caseworker, testified on behalf of the state. Smith testified that he rated Father unsatisfactory overall on the most recent service plan. Smith stated that he had reviewed the files extensively after taking over the case in June 2024, and noted that, throughout the life of the case, Father had "a lot of hit and misses" in complying with services. He concluded that in all that time Father had never rated satisfactory in parenting classes or substance abuse treatment.

¶ 36    Smith testified that he added additional services to the plan in September 2024, including "cooperation, personal hygiene, anger management, visitation, employment/income, and housing/environment," none of which were rated satisfactory. Regarding employment, Father claimed that he worked for cash but never provided proof of income.

¶ 37    Smith had recently received an email from the domestic violence services provider stating that Father had discontinued that service because he had "already done it in the past." Smith summarized his conclusions as follows:

"This is one of the oldest active cases I have. Again, it was originally opened in June of 2022. You know, by the time I got it in June of 2024, something should have already

11

probably been done. To date, we have not had satisfactory progress or reasonable efforts that would suggest I am willing to return the children to their parents at this time."

¶ 38     On cross-examination, Smith said that Father was rated unsatisfactory in substance abuse due to his failure to appear for numerous drug tests. He acknowledged that Father had recently participated in three such tests, all of which were negative. Father testified on his own behalf. He testified that, although he did not have formal employment, he made $1,600 in cash monthly caring for his father. Father said that he completed parenting classes, mental health treatment, and substance abuse treatment. He also completed domestic violence classes although he had some difficulty in getting a certificate. He successfully completed more than 40 drug tests, but acknowledged that he had not attended screenings recently. Father no longer attended screenings in Marion due to a "falling out" and "he" (presumably Smith) refused to allow Father to take them at Egyptian Health.

¶ 39     Father acknowledged that he was asked to retake domestic violence classes. He attended several, then decided not to continue because "they ignored our first batch." He believed he had made reasonable progress, as he had "finished everything."

¶ 40     The court then ruled from the bench regarding fitness. The court found Father unfit in that he failed to protect the children from conditions in their environment injurious to their welfare and he failed to make reasonable progress towards their return during any nine-month period alleged in the termination petition. The court found that the State did not prove that Father failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare. The court did not specifically discuss the remaining allegations of the termination petition.

¶ 41     The court proceeded immediately to a best interest hearing, at which Smith testified that the children were in adoptive placements and were bonded to their foster parents. The foster

parents were good at keeping up to date on health concerns. Molly called her foster mother "mom." Callan and Caedyn, who resided with a different foster family, also considered their foster parents their mom and dad. Smith considered it in the children's best interests to be adopted by their respective foster parents.

¶ 42　Father testified that he loved and missed his children. He stated, "We play a lot, laugh, it's nonstop when we have them. I mean you can't—you run nonstop for two hours, and it's just—it's not enough."

¶ 43　The court ruled from the bench regarding best interest. The court noted it had to consider, *inter alia*, how the minors had adjusted, how they were bonded, how long they had been in care, and whether this was a point they could be returned to Father's care. The court found that it was in the children's best interests to terminate Father's parental rights. Father filed three appeals, which we consolidated.

¶ 44　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 45　Father's appointed appellate counsel concludes that there is no reasonably meritorious argument that the circuit court erred by finding Father unfit or in terminating his parental rights. Counsel observes that, while Father did complete some required services, his actions throughout the case demonstrated that he did not benefit from the services and, as a result, failed to progress toward having the children returned to him.

¶ 46　A proceeding to terminate parental rights occurs in two stages. *In re C.W.*, 199 Ill. 2d 198, 210 (2002). First, the State must prove, by clear and convincing evidence, that the parent is "unfit to have a child" under one or more of the grounds in the Adoption Act. *In re D.T.*, 212 Ill. 2d 347, 352 (2004); see 750 ILCS 50/1(D) (West 2020). Each statutory ground is independent so that if the State proves one, we can affirm the court's finding of unfitness. *In re Veronica J.*, 371 Ill. App.

13

3d 822, 828 (2007). Our standard of review in cases of parental unfitness is limited to determining whether the trial court's decision was against the manifest weight of the evidence. *In re M.S.*, 302 Ill. App. 3d 998, 1002 (1999).

¶ 47    Here, the court found that Father failed to make reasonable progress toward the children's return. "Reasonable progress" requires, at a minimum, measurable or demonstrable movement toward the goal of returning the child home. *In re L.L.S.*, 218 Ill. App. 3d 444, 460-61 (1991). "Reasonable progress" is an objective standard which exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody. *Id.*

¶ 48    Here, Smith, the current caseworker, testified that, despite the case being more than three years old, Father had never progressed to the point where Smith would recommend returning the children to his care. Although Father did complete required services at some point, he took none of it seriously, considered the services to be a "joke," and appeared to be jumping through hoops rather than making a sincere effort to benefit from the services. For instance, although he completed substance abuse treatment, he tested positive for alcohol in August 2023 at 8:30 in the morning. He thereafter missed numerous drug tests, and called agency personnel while apparently intoxicated.

¶ 49    Throughout the case, Father showed belligerence toward caseworkers and aides. In April 2024, he reportedly cursed at the case aide in front of the children, then left a series of vulgar and abusive texts and phone messages with the caseworker. In August 2024, during a visit at the DCFS office, he again threatened the caseworker and staff, causing the visits to be moved to the police

14

station. In September 2024 he sent a vulgar email to the caseworker. In January 2025 he threatened to kill LSSI workers.

¶ 50    Father was requested to repeat services. Given that he failed or refused to do so, combined with the evidence of his belligerence toward staff, failure to take numerous drug tests, and generally poor attitude toward the services, the evidence supports the court's finding that he failed to make reasonable progress toward the children's return was not against the manifest weight of the evidence. The State need prove only one ground of unfitness. *In re Veronica J.*, 371 Ill. App. 3d at 828. Thus, we need not consider whether the State also proved the other grounds alleged in the petition.

¶ 51    Appellate counsel further suggests that the court did not err in finding that the children's best interests required terminating Father's parental rights. Once a parent is found unfit, the proceeding moves to a second stage, at which the court decides whether it is in the children's best interests to terminate parental rights. *In re C.M.*, 319 Ill. App. 3d 344, 360 (2001). At a best-interest hearing, the State's burden of proof is a preponderance of the evidence. *In re D.T.*, 212 Ill. 2d at 366. Our standard of review of the trial court's decision is whether its findings were contrary to the manifest weight of the evidence. *In re Tamera W.*, 2012 IL App (2d) 111131, ¶ 43.

¶ 52    Here, Smith testified that he had observed the children in their foster homes. They were bonded with the foster families, who were meeting their needs. Smith recommended terminating Father's rights so that they could be adopted by their foster parents.

¶ 53    Father testified that he loved and missed his children. However, Father missed many visits and left others early. He berated caseworkers in front of the children. Once, when Callan was crying during a visit, he encouraged him to do so in order to make a point to the visitation supervisor, then shoved him off his lap.

15

¶ 54    Moreover, Father had no verifiable income. He claimed to receive small amounts in cash from taking care of his father but could not present proof. Based on the foregoing, it was not against the manifest weight of the evidence for the court to find that it was in the best interests of the minors to terminate Father's parental rights.

¶ 55    Appellate counsel also considered arguing that Father's trial counsel was ineffective. Parents are entitled to effective assistance of counsel in proceedings to terminate their parental rights. *In re W.L.W. III*, 299 Ill. App. 3d 881, 885 (1998). To show ineffective assistance of counsel in this context, a parent must show that counsel's representation fell below an objective standard of reasonableness and that, but for counsel's errors, the outcome of the proceedings would have been different. *Id.*

¶ 56    Here, appellate counsel did not locate any specific instances of substandard performance by trial counsel, and our review of the record does not reveal any. Trial counsel presented evidence that Father had complied with virtually all of the service plan tasks at one point and had negative drug tests on multiple occasions. In any event, given the evidence detailed above, Father cannot show that any errors by his trial counsel affected the outcome of the proceeding.

¶ 57                                III. CONCLUSION

¶ 58    For the foregoing reasons, we grant appellate counsel leave to withdraw and affirm the circuit court's orders.


¶ 59    Motion granted; orders affirmed.

16